Steven P. Weissman, Esq.
Flavio L. Komuves, Esq.
Brett M. Pugach, Esq.
Weissman & Mintz
220 Davidson Ave., Suite 410
Somerset, N.J. 08873
Phone: (732) 563-4565
sweissman@weissmanmintz.com
fkomuves@weissmanmintz.com
bpugach@weissmanmintz.com

Jennifer Borg, Esq.
Media Freedom & Information Access Clinic
Yale Law School
PO Box 1709
Englewood Cliffs, NJ 07632
(201) 280-5501
Jennifer.Borg@yale.edu

*Attorneys for Plaintiffs Aaron Morrill and
The Jersey City Times, LLC*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AARON MORRILL and THE JERSEY CITY TIMES, LLC, | Civil Action No. |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| STEVEN M. FULOP, in his official capacity, KIMBERLY WALLACE-SCALCIONE, in her official capacity, and the CITY OF JERSEY CITY, | |
| Defendants. | |

## COMPLAINT

Plaintiffs Aaron Morrill and The Jersey City Times, LLC (publisher of the *Jersey City Times*, both interchangeably referred to as "***JCT***"), 64 Wayne St., Jersey City, New Jersey 07302 for their complaint against Defendants Steven M. Fulop (280 Grove Street, Second Floor, Jersey City, N.J. 07302), Kimberly Wallace-Scalcione (280 Grove Street, Second Floor, Jersey City, N.J. 07302), and the City of Jersey City, ("**Jersey City**" or "**City**") (280 Grove Street, Jersey City, N.J. 07302) allege, by and through their attorneys, as follows:

## INTRODUCTION

1.      The right to question and criticize public officials is essential to a healthy democracy, as is a robust, free, and independent press. And yet, when faced with critical reporting by a local news publication, Jersey City's mayor, Steven Fulop, punished the publication and its editor by engaging in a policy and/or custom of viewpoint and content-based discrimination and retaliation that has continued for several years. After Plaintiffs published a story critical of the mayor, Defendants immediately removed Plaintiffs from the City's press email distribution list (the "Press List") and stopped inviting Plaintiffs to official City events altogether. Such retaliation against protected speech is anathema to the First Amendment and threatens to stifle the free flow of information upon which our democracy depends.

2.      Plaintiff Aaron Morrill is founder and editor-in-chief of the *Jersey City Times*, a news publication which covers news in Jersey City. *JCT*'s reporting on local issues depends, in large part, on receiving information and invitations via the Press List—a list of media and community organizations that receive regular email communications from the Jersey City mayor's office. These communications—which include press releases, media advisories, and

invitations to events—allow news organizations to timely report on breaking stories and other matters of public interest to City residents and businesses.

3.      When it was founded in 2019, *JCT* was added to the Press List and routinely received Press List emails. That came to an abrupt end when, on May 20, 2021, *JCT* published an article written by Mr. Morrill that disputed Mayor Fulop's characterization of crime statistics in Jersey City (the "**May 20, 2021 Article**"). The May 20, 2021 Article disputed Mayor Fulop's statements that crime in Jersey City had decreased and explained that crime in the City had actually increased. Rather than contacting *JCT* to dispute the reporting or to request a correction, Mayor Fulop and the City's press secretary, Kimberly Wallace-Scalcione, retaliated against Plaintiffs by removing them from the Press List without any prior notice or explanation.

4.      As a result, Plaintiffs have not been able to timely report on news of public interest to their readers and, in many instances, they have not been able to report on current events at all. Defendants' actions infringe Plaintiffs' constitutional rights and deprive *JCT*'s readers of vital and timely reporting on matters of public interest.

5.      In May and July of 2021, Plaintiff Morrill made repeated requests on behalf of both himself and *JCT* to be added to the Press List but he never received a response from Defendants. It was only after counsel for Plaintiffs contacted Defendants' attorneys informing them that Defendants were violating Plaintiffs' constitutional rights that attorneys for Defendants stated that *JCT* would be "added to the list."

6.      Plaintiffs have not, however, been "added to the list." Plaintiffs have not received a single invitation to a press conference or to any other event since the May 20, 2021 Article was published.

7.      While Plaintiffs now receive occasional and sporadic emails from the City, Plaintiffs receive notification of only some, but not all, events hosted by the City and only after such events have taken place. Yet, these notices are timely distributed to other members of the press—including *JCT*'s local competitors as well as national news organizations. In some instances, the notices are emailed to over two hundred (200) news organizations including those which rarely cover Jersey City. Plaintiffs' ability to report on Jersey City is significantly impaired each time Defendants fail to include them on distributions made to the Press List.

8.      Defendants' actions infringe Plaintiffs' constitutional rights to receive information and to gather and publish news.

9.      Defendants have engaged in unlawful retaliation; have violated Plaintiffs' Fourteenth Amendment equal protection rights, First Amendment equal access rights, and analogous rights under the New Jersey State Constitution; have engaged in viewpoint and content-based discrimination; and have violated Plaintiffs' due process rights.

10.     By removing Plaintiffs from the Press List and failing to notify them of press conferences, public events, and other information of interest to Jersey City residents on a timely basis, Defendants are punishing Plaintiffs and attempting to influence the content and tenor of news reporting. The continued refusal to return Plaintiffs to the Press List, and each failure to timely send Plaintiffs a press release, media advisory, or event invitation impacts Plaintiffs' reporting and constitutes a separate and new violation of Plaintiffs rights under the United States Constitution and New Jersey Constitution. The Defendants' actions seek to impede professional and investigative journalism and silence criticism. These actions are all unconstitutional.

11.     Through this lawsuit, Plaintiffs seek to compel Defendants to fully restore them to the Press List, provide Plaintiffs with information and access on the same basis as other news

organizations and journalists, and ensure that the press remains free to criticize and question the government of Jersey City.

## PARTIES

12.     Plaintiff Aaron Morrill, a resident of Jersey City, New Jersey, is founder and editor-in-chief of the *Jersey City Times*. Mr. Morrill founded *JCT* to provide reliable and informative news focused solely on Jersey City.

13.     Plaintiff The Jersey City Times, LLC is a news organization, formed in Jersey City on June 24, 2019. It publishes an online newspaper, the *Jersey City Times*. Its principal place of business is 64 Wayne Street, Jersey City, New Jersey 07302. The *Jersey City Times*'s mission is to provide credible, community-based, public-service journalism, focused solely on Jersey City. *JCT* is dedicated to high-quality, in-depth coverage of Jersey City's people, neighborhoods, government, schools, businesses, culture, and cuisine. It is a news publication which covers news in Jersey City.

14.     Defendant Steven M. Fulop is the mayor of Jersey City. He is sued in his official capacity. He maintains a place of business at 280 Grove Street, Second Floor, Jersey City, New Jersey 07302. The mayor is the chief executive of the City and appoints the heads of the various departments in the city and other municipal boards and commissions. The mayor's office supervises, directs, and controls all departments of the City government including, upon information and belief, the Press Office.

15.     Defendant Kimberly Wallace-Scalcione is the press secretary for the office of the mayor of Jersey City and her department is listed on the City's website as "Press Office". She is sued in her official capacity. Among other duties, Ms. Wallace-Scalcione is responsible for distributing communications of the mayor's office through the Press List and maintains that list.

As the chief "spokesperson" for the City, Ms. Wallace-Scalcione serves as a liaison between the press and City officials, including Mayor Fulop. She maintains a place of business at 280 Grove Street, Second Floor, Jersey City, New Jersey 07302.

16.     Defendant City of Jersey City is a municipality of the State of New Jersey located in Hudson County. Its City Hall and principal place of business is located at 280 Grove Street, Jersey City, New Jersey 07302.

17.     At all relevant times, Mayor Fulop, Press Secretary Wallace-Scalcione, and Jersey City, as well as their agents, employees, officers, and representatives, have acted under color of state law in adopting and enforcing the policies and/or customs relating to the mayor's office's Press List.

## JURISDICTION AND VENUE

18.     This is an action brought pursuant to 42 U.S.C. § 1983 to redress the deprivation of rights secured by the First and Fourteenth Amendments to the United States Constitution.

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

20.     This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

21.     Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Plaintiffs' related claims arising under state law, namely Article I of the Constitution of New Jersey and the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.

22.     Venue is proper for the New Jersey District Court pursuant to 28 U.S.C. § 1391(a), (b), and (c). The parties reside in this district, and a substantial part of the events giving rise to the claims occurred in this district.

## FACTS

23.     Plaintiff Aaron Morrill is founder and editor-in-chief of the *Jersey City Times*.

24.     *JCT* is a news publication which covers news in Jersey City. Since its founding in 2019, it has become a trusted source for local news. Its articles have been cited by *Politico New Jersey*, the *New Jersey Monitor*, the *Kansas City Star*, the *Jersey Journal*, the *Hudson County View*, and others. The site receives 40,000-60,000 unique visitors each month. The majority of *JCT*'s reporters and advisory board members are professional journalists who have written for other news publications, and many have journalism degrees. *JCT* is a member of the New Jersey Press Association and the Local Independent Online News Publishers organization; many of its writers hold press passes.

**The Press List**

25.     Upon information and belief, the City's press office maintains the Press List—a list of email addresses of journalists and news organizations to which it regularly sends press releases, media advisories, and invitations to various City and press-related events.

26.     Without access to email notifications distributed via the Press List, Plaintiffs have been deprived of a critical means of staying abreast of breaking news, and often miss the opportunity to attend newsworthy events due to inadequate advance notice, or no notice whatsoever. This problem is compounded when competitors are included on the Press List and are able to cover events and publish timely stories before organizations not on the Press List like *JCT* even learn of the events.

27.     On December 4, 2019, the then-editor-in-chief of *JCT*, Dan Levin, emailed Ms. Kimberly Wallace-Scalcione with a request to be put on the Press List. That same day, Press Secretary Wallace-Scalcione agreed, stating: "Yes absolutely. Thanks for reaching out. If you

and/or your team ever want to meet for coffee to talk shop I'd be happy to plan a day. The Jersey City times [sic] reporters I've met so far are fantastic to work with."

28.     Plaintiffs were subsequently added to the Press List with the email address of editor@jcitytimes.com. Between December 4, 2019, and May 19, 2021, Plaintiffs received at least 185 press releases and media advisories from Press Secretary Wallace-Scalcione via the Press List. These included press releases, media advisories, and invitations to events such as press conferences.

29.     Upon information and belief, a media advisory is sent when the City is inviting the press to an event such as a press conference and a press release is used to relay news about the City or the government that may be of interest to the press and its readers.

30.     Defendants have never published or informed Plaintiffs of any criteria or standards explaining which news organizations are included in, or permitted to remain on, the Press List.

**Plaintiffs' Critical Reporting, Resulting Animus, and Removal from the Press List**

31.     On May 20, 2021, *JCT* published the May 20, 2021 Article—a story critical of Mayor Fulop, disputing his characterization of crime statistics. Aaron Morrill, *While Press Says Otherwise, Crime Is Up Under Mayor Fulop*, Jersey City Times (May 20, 2021) (attached hereto as **Exhibit A**).

32.     The May 20, 2021 Article—authored by Plaintiff Morrill—analyzed FBI data to explain that, despite *The Wall Street Journal* and *The Jersey Journal* stories that claimed Mayor Fulop's administration had successfully reduced violent crime, crime in Jersey City had gone up overall in the years since Fulop's election. The May 20, 2021 Article also debunked Mayor

Fulop's repeated claims that Jersey City homicides had reached historic lows, reporting, instead, that "there had been virtually no progress" in homicide reduction.

33.     The day the May 20, 2021 Article was published, a reporter at another local news organization asked Press Secretary Wallace-Scalcione whether he could "get something to dispute" *JCT*'s reporting that "crime is up in Jersey City." Press Secretary Wallace-Scalcione forwarded that email to Mayor Fulop with her proposed response accusing *JCT* of pursuing an "unethical misinformation campaign," "deceiving the public for the benefit of their personal agenda against this administration," and publishing "despicable lies."

34.     Press Secretary Wallace-Scalcione wrote back to the reporter, stating "The JC Times has consistently misrepresented information, and they don't hide their political agenda against the Mayor. To be clear, It [*sic*] is run by a perennial failed political candidate in Dan Levin that has run against the Mayor as part of the previous Mayor's team, and his financial benefactor Aaron Morrill who also has been a vocal political supporter of the Mayor's opposition. We don't respond to their blog because it is simply not a legitimate news source."

35.     On or shortly after May 20, 2021, Plaintiffs stopped receiving any emails from the press office.

36.     Defendants continued refusal to return Plaintiffs to the Press List and each failure to send timely Plaintiffs a press release, media advisory, or event invitation impacted Plaintiffs' reporting and is a separate and new violation of Plaintiffs rights under the United States Constitution and New Jersey Constitution.

37.     Defendants provided no notice to Plaintiffs that they were being removed from the Press List nor did they provide any explanation as to why Plaintiffs were removed.

38.     On or about May 24, 2021, after becoming aware that Plaintiffs were removed from the Press List, Plaintiff Morrill wrote to Press Secretary Wallace-Scalcione asking if Plaintiffs had inadvertently been left off the Press List.

39.     Mr. Morrill received no response.

40.     On June 9, 2021, *JCT* published an editorial that criticized Mayor Fulop's plan to bring an outpost of the Pompidou Center to Jersey City: "The use of so much money on a cultural project that will cater largely to highly educated, well-heeled residents is simply immoral given the city's myriad needs and vast economic disparities." Aaron Morrill, *Editorial: The Immoral Price of Pompidou*, Jersey City Times (June 9, 2021) (attached hereto as **Exhibit B**).

41.     Shortly thereafter, in an email to a Jersey City resident on June 11, 2021, Mayor Fulop referred to *JCT* as "yellow journalism" and stated that he did not "put much into []JcTime" or "onejc" because they were "both run by Dan Levin and Aaron Morrill who are failed candidates at length and consistently push outright lies."

42.     "One JC" was a Facebook group operated by *JCT*'s former editor-in-chief, Dan Levin.

43.     On June 15, 2021, the chief marketing officer of AeroFarms, a local vertical farming company, reached out to Stacey Flanagan, Jersey City's director of health and human services, to ask whether Liz Morrill, Plaintiff Morrill's wife and a *JCT* reporter, who had asked him a number of questions about AeroFarms' collaboration with the City was "a 'friendly.'" Ms. Flanagan responded that "I do not believe JC Times is friendly."

44.     In the same email thread, also on June 15, 2021, Press Secretary Wallace-Scalcione explained that "we do not engage at all with the JC Times. They are a completely bias [*sic*] blog with very little readership and not a real news outlet."

45.     In response to Press Secretary Wallace-Scalcione's email, also on June 15, 2021, Mayor Fulop added, of *JCT*, that "[t]here is no benefit to engaging them IMO as it will not change what they are writing."

46.     On June 24, 2021, Mayor Fulop wrote, in an email to the executive director of a nonprofit supporting the visual arts, that an editorial written by *JCT* was "yellow journalism by two miserable people in Dan levin and Aaron morril [*sic*], Very little of what they write is factual on most subjects and they use that jc times [sic] as a political tool to hurt me. Dan Levin Ran [sic] for council and mayor with my predecessor and Aaaron [sic] is his best friend. Not worth the time on a response."

47.     In an email sent on June 29, 2021, Mayor Fulop referred to Mr. Levin and Mr. Morrill as "as big hacks as they come" and again referred to a critical story as "yellow journalism." When the person asked whether a lot of people read *JCT*, the mayor responded: "No. Very little."

48.     On July 21, 2021, after months of being banned from the Press List and having not received any emails whatsoever from the mayor's office, Mr. Morrill emailed Press Secretary Wallace-Scalcione and copied the mayor reminding them that they had not responded to his May 24, 2021 email questioning why *JCT* had not received a press release. He stated that *JCT* had not received any of the 15 press releases that they had sent out to the media since May 17, 2021 and that it was not invited to at least one press event that had been held.

49.     Notably, Mr. Morrill also wrote: "Actions that have the effect of chilling vigorous reporting by the press strike at the very heart of the First Amendment to the Constitution of the United States. We will be discussing our legal options with counsel. In the meantime, it is my

sincere hope that you and the mayor will reverse this ill-advised, and quite possibly illegal, policy."

50.     Press Secretary Wallace-Scalcione forwarded Mr. Morrill's email to the mayor that very same day stating, in relevant part: "JC Times says they are 'discussing our legal options with counsel'. Please see their full email below. I will not respond unless you say otherwise." Defendants did not respond.

51.     On July 23, 2021, Casey Georgi, then a *JCT* reporter, emailed Press Secretary Wallace-Scalcione asking for comment on an upcoming story about the administration's failure to respond to *JCT*'s OPRA requests and the fact that *JCT* was "no longer receiving . . . press releases and invitations to press events."

52.     That same day, Press Secretary Wallace-Scalcione forwarded Ms. Georgi's email to Mayor Fulop, stating, in relevant part: "I won't comment unless you say otherwise." Ms. Georgi received no response.

53.     In a letter dated April 7, 2022, attorneys representing Plaintiffs wrote to the City's attorney, objecting to Plaintiffs' removal from the Press List, and City officials' refusals to respond to requests for comment from *JCT* reporters.

54.     The six-page letter informed Defendants that they were violating Plaintiffs' First and Fourteenth Amendment rights as well as their due process rights and that Defendants were engaging in unlawful First Amendment retaliation and discrimination. The letter included case law and facts obtained from public records requests supporting its legal claims and requested that Defendants immediately return *JCT* to the Press List and resume responding to requests for comment from *JCT*'s reporters. The letter requested that the City attorney respond by no later than April 15, 2022.

55.     The City attorney did not respond to the April 7, 2022 letter.

56.     On April 24, 2022, Plaintiffs' attorneys sent a follow up email to the City's attorney, John McKinney, again requesting that the City reinstate Plaintiffs to the Press List especially since to do so would require a "*de minimus* amount of time and effort and would obviate the need to waste taxpayers' dollars further addressing this issue." Plaintiffs' attorney further requested knowing the City's position by April 27, 2022.

57.     On April 25, 2022, the City's attorney responded to Plaintiffs' attorneys, stating that he "believe[d] the 'editor' account was added to the list." He further added that Press Secretary Wallace-Scalcione had informed him that "no press releases have gone out lately since the account was added to the list."

58.     But Plaintiffs were not added to the "list." At 12:15 p.m. on April 26, 2022, Press Secretary Wallace-Scalcione sent a media advisory inviting over 200 members of the press to the nation's largest immigration conference. At 4:34 p.m.; 4:35 p.m.; 4:38 p.m.; and 4:53 p.m. she sent this very same media advisory to additional news organizations. Plaintiffs did not receive this media advisory and were not invited to the event even though Press Secretary Wallace-Scalcione took the time to send the very same email out four (4) separate times that day to multiple members of the press each time.

59.     On April 27, 2022, Press Secretary Wallace-Scalcione emailed the *Daily Wire* the same media advisory about the immigration conference that she sent to news organizations on April 26, 2023. Plaintiffs did not receive this media advisory and were not invited to the event.

60.     On May 2, 2022, Press Secretary Wallace-Scalcione sent a media advisory inviting the local press to a cancer campaign event. Plaintiffs did not receive this media advisory and were not invited to the event.

61.     On May 2, 2022, Press Secretary Wallace-Scalcione emailed a media advisory inviting the press to an event where the mayor and council would unveil a retractable roof over a public pool. Plaintiffs did not receive this media advisory and were not invited to the event.

62.     On May 4, 2022, Press Secretary Wallace-Scalcione emailed the press release about the retractable roof to additional news organizations. Plaintiffs did not receive this press release and were not invited to the event.

63.     On May 5 and 6, 2022, Ms. Wallace-Scalcione sent a media advisory inviting the press to a press conference concerning fallen police officers. Plaintiffs did not receive this media advisory and were not invited to the event.

64.     Plaintiff Morrill knew from reading other publications that other members of the press were invited to and writing about events and press conferences to which neither he nor *JCT* had been invited.

65.     Accordingly, on May 6, 2022, Plaintiffs' attorneys emailed the City's attorney to confirm whether Plaintiffs had, in fact, been added back to the Press List.

66.     On May 17, 2022, Mr. Jeremy Jacobsen, assistant corporation counsel to the City, emailed Plaintiffs' attorneys stating that he had confirmed with Press Secretary Wallace-Scalcione that "there was not actually a press release sent yesterday." He added: "My understanding is that your client should be included and see the next one that is sent though. Our press secretary will be out next week, so that may not be until the following week."

67.     Although it was not known whether Defendants maintained more than one list for sending press releases, media advisories and other notices to the press, counsel for Defendants wrote about a single "list" in their April 25, 2022 email to Plaintiffs' counsel. *See supra* ¶ 57. The City attorney represented that Plaintiffs would be "added," and "included" on this "list".

68.     Despite the City attorneys' representation that Plaintiffs would be restored to what they described as the "list," Plaintiffs have not been invited to a single press conference or live in-person event since the May 20, 2021 Article was published despite the fact that the entire local press corps, and often the metropolitan New York press corps, have been invited.

69.     On May 19, 2022, Press Secretary Wallace-Scalcione emailed a media advisory inviting the press to an active shooter drill. Plaintiffs did not receive this media advisory and were not invited to the event.

70.     On October 26, 2022, Press Secretary Wallace-Scalcione emailed to members of the press a statement from the mayor regarding crime reductions. Plaintiffs did not receive this email.

71.     On November 21, 2022, at 11:51 a.m., Press Secretary Wallace-Scalcione sent a media advisory inviting over 200 members of the press to attend a ceremony promoting various police officers to be held on November 22. On November 22 at 2:11 p.m. after the event took place, Press Secretary Wallace-Scalcione sent a press release about the event. Plaintiffs did not receive the press release or media advisory and were not invited to the event. Plaintiffs only received a press release on November 23 after the event had already concluded.

72.     On November 23, 2022, Press Secretary Wallace-Scalcione sent a press release regarding the award for the "Municipal Project of the Year" and inviting the press to attend the ceremony. Plaintiffs were not invited and only received the press release on November 23, 2022, after the event had already concluded.

73.     On November 28, 2022, Press Secretary Wallace-Scalcione sent a media advisory to over 200 members of the press inviting them to an event where the mayor would announce the promotion of the City's first female deputy fire chief. Plaintiffs did not receive the media

advisory and were not invited to the event. Plaintiffs received a press release on November 29, 2022 after the event had concluded.

74.     On December 16, 2022, Press Secretary Wallace-Scalcione sent a media advisory inviting over two hundred members of the press to the mayor's end of the year review of crime and public safety where city officials would answer reporters' questions. This media advisory was sent again on December 19 to an unknown number of news organizations. On December 20, 2022, Press Secretary Wallace-Scalcione emailed various reporters thanking them for attending and attaching graphics to accompany their stories. Plaintiffs were not invited and did not receive any of the media advisories.

75.     On February 7, 2023, Press Secretary Wallace-Scalcione emailed a press release regarding animal cruelty to over two hundred members of the press. Plaintiffs did not receive this press release.

### Mayor Fulop's Animus Towards Plaintiffs Continues

76.     Defendants' animus towards Plaintiffs is further demonstrated by Mayor Fulop's public response to a February 22, 2023 article by *JCT*. On that date, *JCT* ran a story by Plaintiff Morrill that described a trip Mayor Fulop took, along with City Council Members and department heads, to Paris to meet with Pompidou Museum officials. The story was critical that the trip was not widely publicized, and thus appeared secretive. Aaron Morrill, *Mayor Travels in Secret to Paris with Council Members and Department Heads*, Jersey City Times (Feb. 22, 2023) (attached hereto as **Exhibit C**).

77.     In an interview with the *Hudson County View*, published on March 8, 2023, Mayor Fulop alleged that "misinformation" surrounding the Paris trip had originated with "misleading, non-factual" reporting by *JCT*. In this interview, Mayor Fulop repeatedly referred

to *JCT* as a "blog" and said that it was run by "a trust fund baby that's kind of been lost for a long time trying to find his way and established [*JCT*] because he's never been successful at anything else."

78.     In that interview, Mayor Fulop conceded that he treats *JCT* differently than other news organizations by stating that he provides information to "legitimate news sources," but that it's a waste of time to engage with "blogs that repeatedly promulgate misinformation or anonymous sources." John Heinis, *Non-profit arm of Jersey City EDC paid for 8 officials to travel to Paris, mayor says*, Hudson County View (Mar. 8, 2023) (attached hereto as **Exhibit D**).

***Defendants Unlawful Conduct Towards Plaintiffs Continues***

79.     On March 1, 2023, Press Secretary Wallace-Scalcione emailed a media advisory at 11:43 a.m. inviting the press to attend a press conference regarding a major affordable housing development—the Holland Gardens complex. She also sent this same media advisory again at 11:44 a.m. to numerous additional news organizations. Plaintiffs did not receive the media advisory and were not invited to the event.

80.     On March 2, 2023, Press Secretary Wallace-Scalcione emailed a reminder media advisory to the press reminding them of the press conference regarding the Holland Gardens complex and emailed a competitor of Plaintiffs inquiring if they would be attending. Plaintiffs did not receive this reminder. Upon information and belief, reporters from the *Hudson County View* and *Jersey Journal* attended the Holland Gardens press conference. Plaintiffs received a press release of the event but only after it had concluded.

81.     On March 28, 2023, Press Secretary Wallace-Scalcione emailed a media advisory inviting the press to the mayor's "State of the City" address. Plaintiffs did not receive this media advisory and were not invited to the event.

82.   On March 31, 2023, Press Secretary Wallace-Scalcione sent a media advisory inviting the press to the opening of the new public safety headquarters. Plaintiffs did not receive this media advisory and were not invited to the event.

83.   On April 3, 2023, Press Secretary Wallace-Scalcione sent an updated media advisory inviting over 200 press organizations/journalists about the opening of the public safety headquarters. She also sent this same media advisory to an unknown number of media outlets on April 4 and a reminder about it on April 10, 2023. Plaintiffs did not receive these media advisories. Plaintiffs received a press release about the event on April 11, 2023, after it had concluded.

84.   On April 10, 2023, Press Secretary Wallace-Scalcione sent a media advisory to the press inviting them to the opening of a public safety headquarters to be held on April 11, 2023. A reminder email containing the same media advisory was sent again to the press that same day. Plaintiffs were not invited to the event and only received a press release about it after it had concluded.

85.   On April 18, 2023, Press Secretary Wallace-Scalcione sent a press release announcing an event or press conference held by the Mayor on April 18 marking Earth Day. Because this event was covered by other media, it is presumed that other members of the press had advance notice of the April 18 event. Plaintiffs were not invited to the event and only received a press release about it after it had concluded.

86.   On July 11, 2023, Press Secretary Wallace-Scalcione sent a media advisory to the press about a ribbon-cutting ceremony for a ferry service from Port Liberte. Plaintiffs did not receive this media advisory and were not invited to the event.

***Plaintiffs' Attorneys Once Again Inform Defendants of Their Continuing Unlawful Conduct Yet Defendants Continue to Violate Plaintiffs' Rights***

87.     On July 25, 2023, attorneys representing Plaintiffs again wrote to the City's Corporation Counsel, objecting to Plaintiffs' removal from the Press List. The eight-page letter informed Defendants that they were violating Plaintiffs' First and Fourteenth Amendment rights as well as their due process rights and that Defendants were engaging in unlawful First Amendment retaliation and discrimination. The letter included case law and facts obtained from public records requests supporting its legal claims and requested that Defendants immediately return *JCT* to the Press List and resume responding to requests for comment from *JCT*'s reporters. The letter requested that the City's attorney respond by no later than August 2, 2023.

88.     Although Plaintiffs' attorneys put Defendants on clear notice that their actions violated constitutional rights protected by both the United States Constitution and the New Jersey Constitution, the City and its attorneys have yet to respond to the July 25, 2023 letter.

89.     On September 11, 2023, Press Secretary Wallace-Scalcione sent a press release to Plaintiffs about a 911 Memorial Service on the Jersey City waterfront to which Plaintiffs were not invited. Based on other news reports about the event, it is clear that other members of the press had notice of the event and were invited to attend so they could report on it.

90.     On September 13, 2023, at 1:26 p.m., Press Secretary Wallace-Scalcione distributed a press release announcing the debut of a new affordable housing complex. Plaintiffs were not sent the release until after the event had concluded, although its competitor (*The Hudson County View*) was present at the event, having apparently received advance notice.

91.     On October 17, 2023, Plaintiffs received a press release regarding a press conference the mayor held regarding the New Jersey cannabis law. Plaintiffs were not invited to the press conference and received the press release only after the press conference had concluded.

92.     On November 21, 2023, Plaintiffs received a press release regarding a ceremony Mayor Fulop attended to promote various members of the fire department. Plaintiffs were not invited to the event and received the press release only after the event had concluded.

93.     On November 24, 2023, attorneys representing Plaintiffs yet again wrote to the City's Corporation Counsel, objecting to Plaintiffs' removal from the Press List and denial of access to official press communications. The letter requested, in part, that Defendants end their unconstitutional treatment of *JCT*, and cease any further discrimination and retaliation against *JCT*.

94.     On December 1, 2023, Press Secretary Wallace-Scalcione sent out a press release about one of the biggest stories of the month involving a Palestinian-American who claimed that he was assaulted while being called a terrorist.  Plaintiffs did not receive the press release but their competitors did.

95.     On December 14, 2023, the City's Corporation Counsel responded to Plaintiffs' attorneys November 24, 2023 letter repeating Defendants' previous claims that Plaintiff *JCT* "is already added to the press list for the City of Jersey City and will receive future press releases and media advisories."

96.     Upon information and belief, on or about December 15, 2023, the City emailed an invitation to various news organizations inviting them to attend a press conference to discuss the 2023 Jersey City Public Safety Recap with the mayor, the City's Public Safety Director and US Attorney Phil Sellinger.  Plaintiffs did not receive this emailed invitation.

97.     Plaintiffs continue to receive only sporadic and belated notices of local events and have not received a single invitation to a press conference or event to which other members of the press have been invited since the May 20, 2021 Article was published.

*Harm to Plaintiffs' Reporting and First Amendment-Protected Activities*

98.    Even though Plaintiffs and their attorneys repeatedly contacted Defendants informing them that their ban of Plaintiffs was unconstitutional and requesting that Plaintiffs be returned to the Press List, Defendants continue to engage in a policy and/or custom of retaliatory and discriminatory conduct. Plaintiffs have received only sporadic and belated notices of local events and have not received a single invitation to a press conference or event to which other members of the press have been invited.

99.    By not receiving press releases, media advisories, and invitations on the same basis as competitor news organizations, Plaintiffs are significantly harmed in their ability to access and gather news and to inform their readers of breaking news. Each missed news event amounts to a significant injury, one that puts Plaintiffs at a competitive disadvantage and robs Plaintiffs' readers of the opportunity to be fully informed of current events.

100.    Defendants' actions chilled Plaintiffs' protected speech on multiple occasions. Plaintiffs were unable to produce coverage of timely, newsworthy events taking place in relation to the mayor's office due to their exclusion from the Press List and by not receiving press releases, media advisories, and invitations on the same basis as competitors.

101.    Other members of the press who have not published stories critical of the mayor's statements concerning crime rates and/or the trip to Paris continue to receive emails from the Press Office and invitations to various press events.

102.    Media advisories, press releases, and invitations continued to be sent not only to *JCT*'s local competitors but also inexplicably to major national news organizations such as *ABC News*, the *Huffington Post*, and *The New York Times,* all of which infrequently cover City events.

103.    Defendants continued refusal to return Plaintiffs to the Press List and each failure to timely send Plaintiffs a press release, media advisory, or event invitation impacted Plaintiffs' reporting and is a separate and new violation of Plaintiffs rights under the United States Constitution and New Jersey Constitution.

104.    Defendants' conduct is clearly punitive and retaliatory.

105.    Defendants are aware that their conduct was unlawful and yet they continue their policy and/or custom of unconstitutional retaliation, discrimination, and denial of Due Process and Equal Protection.

106.    Plaintiffs and Plaintiffs' counsel certainly reminded Defendants that their conduct was unlawful in their correspondence to Defendants and their counsel on July 21, 2021, April 7, 2022, April 24, 2022, July 25, 2023, and November 24, 2023.

107.    Defendants continue to flagrantly ignore their official duty to comply with the law and have reacted in a vindictive and punitive manner to silence criticism of what they deem biased or illegitimate reporting.

### CAUSES OF ACTION

### COUNT I – 42 U.S.C. § 1983 – First Amendment Retaliation
### (Against All Defendants)

108.    Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as though each were individually stated herein.

109.    Plaintiffs wrote and published the May 21, 2021 Article, which criticized Mayor Fulop's characterization of crime statistics.

110.    Plaintiffs' writing and publishing of the May 21, 2021 Article is constitutionally protected under the First Amendment's free speech and free press clauses.

111.    Defendants were aware of Plaintiffs' reporting, disapproved of it, and removed Plaintiffs from the Press List shortly after the May 21, 2021 Article was published.

112.    Plaintiffs and their attorneys repeatedly requested that Plaintiffs be returned to the Press List so that they can receive press releases and media advisories informing them about matters of public concern and attend press conferences and other events hosted or sponsored by the City.

113.    Defendants represented that Plaintiffs were restored to the Press List in May 2022, however, Plaintiffs have not been restored to the Press List and continue to receive only sporadic and belated access to notices of local events and press conferences only after such events have taken place.  Yet, other journalists and news organizations have received advance notice and have been invited to numerous press conferences and events.

114.    Defendants have made numerous statements reflecting their animus and contempt towards Plaintiffs.

115.    The timing of Defendants' actions coupled with comments made by the individual defendants reflecting their animus towards Plaintiffs demonstrates the removal from the Press List was substantially motivated by Plaintiffs' constitutionally protected activities—specifically the reporting on and criticisms of Mayor Fulop and his administration by Plaintiffs.

116.    The temporal proximity between Plaintiffs' protected activity and Defendants' pattern of animus towards Plaintiffs establishes a causal link between Plaintiffs' constitutionally protected activities and the retaliatory action—removal from the Press List.

117.    By banning Plaintiffs from the Press List, Defendants seek to silence criticism and impede Plaintiffs' newsgathering and reporting.

118.    Defendants' actions would deter a person of ordinary firmness from publishing stories critical of the mayor and his administration and chill their protected speech because exclusion from the Press List hinders timely and effective reporting.

119.    And Defendants' actions did in fact chill Plaintiffs' protected speech on multiple occasions. Plaintiffs were unable to provide coverage of timely, newsworthy events taking place in the City due to their exclusion from the Press List. For online publications such as *JCT*, timely access to newsworthy events is paramount.

120.    Defendants' retaliatory conduct interfered with Plaintiffs' ability to gather and publish the news.

121.    Plaintiffs are being forced to alter their constitutionally protected activities as a result of their exclusion from the Press List.

122.    Defendants' actions were carried out, and continue to be carried out, under color of law and pursuant to municipal policy and/or custom.

123.    Acting under color of law, Defendants created, followed, encouraged and enforced a written or unwritten policy and/or custom of interfering with and violating Plaintiffs' constitutional rights—and continue to do so.

124.    Defendants know that their actions are unlawful and violate Plaintiffs constitutional rights.

125.    Defendants have violated the provisions of 42 U.S.C. § 1983 by, acting under color of state law, depriving Plaintiffs of the privileges secured by the First Amendment of the United States Constitution.

126.    Defendants' actions constitute unlawful retaliation against Plaintiffs in violation of their First Amendment rights of free speech and freedom of the press.

127.     Defendants continued refusal to return Plaintiffs to the Press List and each failure to timely send Plaintiffs a press release, media advisory, or event invitation impacted Plaintiffs' reporting and is a separate and new violation of Plaintiffs rights under the United States Constitution.

128.     Unless enjoined by this Court, Defendants will continue to violate the First Amendment rights of Plaintiffs and Plaintiffs will continue to suffer serious and irreparable harm to their constitutional rights.

## COUNT II – 42 U.S.C. § 1983 – First & Fourteenth Amendment Equal Protection
### (Against All Defendants)

129.     Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as though each were individually stated herein.

130.     Defendants have intentionally treated Plaintiffs differently than other news organizations and there is no rational basis, much less compelling reason, for the difference in treatment.

131.     Plaintiffs have First Amendment liberty interests in access to information, the right to receive information, the right to speak, the right to listen, and the right to gather and publish the news.

132.     The First Amendment requires that "[o]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable." *Am. Broadcasting Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977).

133.     The First Amendment prohibits government from denying one journalist access to information for less than compelling reasons when it grants similar access to others.

134.     The Equal Protection Clause of the Fourteenth Amendment requires government to grant equal treatment to its citizens and not discriminate among them with respect to their fundamental rights. It requires all journalists have equal access to information—a right protected by the First Amendment—generally available to news media.

135.     Plaintiff *JCT* is one of the chief purveyors of news in Jersey City and therefore is similarly situated to other news organizations who remain on the Press List.

136.     Plaintiff Morrill, like other reporters who have access to the Press List, covers news about Jersey City and therefore is similarly situated to other reporters who remain on the Press List.

137.     Defendants' removed Plaintiffs from the Press List, while other similarly situated reporters and news organizations remain on the Press List.

138.     Upon information and belief, Plaintiffs are the only news organization and reporter that have been removed and continue to be excluded from the Press List.

139.     Defendants' removal and continued exclusion of Plaintiffs from the Press List was intentional and motivated by the content and viewpoint of Plaintiffs' reporting on Mayor Fulop and his administration and Defendants' animus towards Plaintiffs.

140.     Such content-based discrimination, viewpoint-based discrimination, and animus cannot constitute a rational basis, much less a compelling reason, for the difference in treatment.

141.     Plaintiffs are in a class of one, and their exclusion from the Press List and unequal access to the benefits of the Press List is a denial of the equal protection of their First Amendment protected rights and a violation of the Fourteenth Amendment.

142.     Defendants' actions alleged herein were carried out, and continue to be carried out under color of law and pursuant to City policy and/or custom.

143.    Acting under color of law, Defendants created, followed, encouraged and enforced a written or unwritten policy and/or custom of interfering with and violating Plaintiffs' constitutional rights—and continue to do so.

144.    By banning Plaintiffs from the Press List and treating them differently than similarly situated reporters and news organizations, Defendants seeks to silence criticism and impede Plaintiffs' newsgathering and reporting.

145.    Defendants have violated the provisions of 42 U.S.C. § 1983 by, acting under color of state law, depriving Plaintiffs of the privileges secured by the First and Fourteenth Amendments of the United States Constitution.

146.    Defendants' actions did in fact chill Plaintiffs' protected speech on multiple occasions.  Plaintiffs were unable to provide coverage of timely, newsworthy events taking place in the City due to their exclusion from the Press List.  For online publications such as *JCT*, timely access to newsworthy events is paramount.

147.    Defendants continued refusal to return Plaintiffs to the Press List and each failure to timely send Plaintiffs a press release, media advisory, or event invitation impacted Plaintiffs' reporting and is a separate and new violation of Plaintiffs rights under the United States Constitution.

148.    Unless enjoined by this Court, Defendants will continue to violate the First and Fourteenth Amendment rights of Plaintiffs and Plaintiffs will continue to suffer serious and irreparable harm to their constitutional rights.

### COUNT III – 42 U.S.C. § 1983 –First Amendment Equal Access
### (Against All Defendants)

149.    Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as though each were individually stated herein.

150. Plaintiffs have a First Amendment right to access information, the right to receive information, the right to speak, the right to listen, and the right to gather and publish the news.

151. The First Amendment requires that "[o]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer by tenable." *Am. Broadcasting Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977).

152. The First Amendment prohibits government from denying one journalist access to information for less than compelling reasons when it grants similar access to others.

153. Defendants have treated Plaintiff differently from similarly situated journalists and news organizations.

154. Plaintiff *JCT* is a news publication which covers news in Jersey City and issues of public concern to its residents and therefore is similarly situated to other news organizations who remain on the Press List.

155. Plaintiff Morrill, like other reporters who have access to the Press List, covers news about Jersey City and therefore is similarly situated to other reporters who remain on the Press List.

156. Defendants removed Plaintiffs from the Press List, while other reporters and news organizations remained on the Press List, including national news organizations such as *Bloomberg*, the *Huffington Post*, and the *New Yorker* and hyperlocal websites such as *Everything Jersey City*. To this day, Plaintiffs receive only sporadic and belated access to notices of local events and press conferences only after such events have taken place.

157. Upon information and belief, Plaintiffs are the only news organization and reporter that have been removed from and continue to be excluded from the Press List.

158.    Defendants' removal and continued exclusion of Plaintiffs from the Press List was intentional and motivated by the content and viewpoint of Plaintiffs' reporting on Mayor Fulop and his administration and Defendants' animus towards Plaintiffs.

159.    Such content-based discrimination, viewpoint-based discrimination, and animus cannot constitute a rational basis, much less a compelling reason, for the difference in treatment.

160.    By banning Plaintiffs from the Press List and treating them differently than similarly situated reporters and news organizations, Defendants seeks to silence criticism and impede Plaintiffs' newsgathering and reporting.

161.    Defendants' actions alleged herein were carried out and continue to be carried out under color of law and pursuant to City policy and/or custom.

162.    Acting under color of law, Defendants created, followed, encouraged and enforced a written or unwritten policy and/or custom of interfering with and violating Plaintiffs' constitutional rights—and continue to do so.

163.    Defendants have violated the provisions of 42 U.S.C. § 1983 by, acting under color of state law, depriving Plaintiffs of the privileges secured by the First Amendment of the United States Constitution.

164.    Defendants' actions did in fact chill Plaintiffs' protected speech on multiple occasions.  Plaintiffs were unable to provide coverage of timely, newsworthy events taking place in the City due to their exclusion from the Press List.  For online publications such as *JCT*, timely access to newsworthy events is paramount.

165.    Defendants continued refusal to return Plaintiffs to the Press List and each failure to timely send Plaintiffs a press release, media advisory, or event invitation impacted Plaintiffs'

reporting and is a separate and new violation of Plaintiffs rights under the United States Constitution.

166.    Unless enjoined by this Court, Defendants will continue to violate the First Amendment rights of Plaintiffs and Plaintiffs will continue to suffer serious and irreparable harm to their constitutional rights.

### COUNT IV – 42 U.S.C. § 1983 –Viewpoint- and/or Content-Based Discrimination in Violation of First Amendment Rights of the Freedom of Speech and Freedom of the Press (Against All Defendants)

167.    Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as though each were individually stated herein.

168.    Plaintiffs have a First Amendment right to access information, the right to receive information, the right to speak, the right to listen, and the right to gather and publish the news.

169.    Defendants' decision to remove Plaintiffs from the Press List and refuse to provide them equal access to the benefits of the Press List is based on Plaintiffs' viewpoint and the content of their speech and is a violation of the First Amendment.

170.    In response to the May 20, 2021 Article, Defendants removed Plaintiffs from the City's press distribution list thereby denying Plaintiffs access to press notices and press invitations.

171.    By removing and continuing to exclude Plaintiffs from the Press List, Defendants have deprived Plaintiffs of their right to access and receive information, their right to speak, their right to listen, and their right to gather and publish the news. Plaintiffs have been deprived of their right to effectively report on and publish news about Jersey City.

172.    Defendants' removal and continued exclusion of Plaintiffs from the Press List was motivated by Plaintiffs' critical reporting on Mayor Fulop and constitutes unlawful content and viewpoint discrimination.

173.    Defendants have no lawful reason for banning Plaintiffs from the Press List and, even if they did, the removal from full access to the Press List is not rationally related, much less, narrowly tailored, to achieve any legitimate governmental interest.

174.    Defendants' actions alleged herein were carried out, and continue to be carried out under color of law and pursuant to municipal policy and/or custom.

175.    Acting under color of law, Defendants created, followed, encouraged and enforced a written or unwritten policy and/or custom of interfering with and violating Plaintiffs' constitutional rights—and continue to do so.

176.    Defendants have violated the provisions of 42 U.S.C. § 1983 by, acting under color of state law, depriving Plaintiffs of the privileges secured by the First Amendment of the United States Constitution.

177.    Defendants' actions did in fact chill Plaintiffs' protected speech on multiple occasions.  Plaintiffs were unable to provide coverage of timely, newsworthy events taking place in the City due to their exclusion from the Press List.  For online publications such as *JCT*, timely access to newsworthy events is paramount.

178.    Defendants continued refusal to return Plaintiffs to the Press List and each failure to timely send Plaintiffs a press release, media advisory, or event invitation impacted Plaintiffs' reporting and is a separate and new violation of Plaintiffs rights under the United States Constitution.

179.    Unless enjoined by this Court, Defendants will continue to violate the First Amendment rights of Plaintiffs and Plaintiffs will continue to suffer serious and irreparable harm to their constitutional rights.

## COUNT V – 42 U.S.C. § 1983 – Fourteenth Amendment Due Process
### (Against All Defendants)

180.     Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as though each were individually stated herein.

181.     Government entities, including the Defendants here, cannot deprive individuals of a property or liberty interest without due process of law.

182.     Procedural due process requires both notice and an opportunity to be heard at a meaningful time and in a meaningful manner.

183.     Plaintiffs' have a strong First Amendment liberty interest in full access to the Press List in exercise of their First Amendment right to access information, the right to receive information, the right to speak, the right to listen, and the right to gather and publish the news.

184.     Defendants had no published objective criteria for how one gains access to, remains on, or can be excluded from the Press List. Defendants' removal of Plaintiffs from the Press List and subsequent denial of equal access to the full benefits of the Press List did not provide Plaintiffs an opportunity to be heard before revoking their access. Nor have Defendants provided Plaintiffs with any avenue to challenge or appeal the decision to remove their access.

185.     Any interest Defendants have in instituting and enforcing the ban from the Press List and denying equal access to the benefits of the Press List does not justify depriving Plaintiff of an opportunity to be heard or challenge their removal from the Press List and lack of full access to the benefits of the Press List.

186.     Defendants' policy and/or custom on which it relies is unconstitutionally vague, provides Defendants with complete discretion on imposing bans to the Press List, and cannot justify Plaintiffs' removal from the email list.

187.    Defendants' actions alleged herein were carried out, and continue to be carried out under color of law and pursuant to City policy and/or custom.

188.    Acting under color of law, Defendants created, followed, encouraged and enforced a written or unwritten policy and/or custom of interfering with and violating Plaintiffs' constitutional rights.

189.    Defendants have violated the provisions of 42 U.S.C. § 1983 by, acting under color of state law, depriving Plaintiffs of the privileges secured by the Fourteenth Amendment of the United States Constitution.

190.    Defendants continued refusal to return Plaintiffs to the Press List and each failure to timely send Plaintiffs a press release, media advisory, or event invitation impacted Plaintiffs' reporting and is a separate and new violation of Plaintiffs rights under the United States Constitution.

191.    Unless enjoined by this Court, Defendants will continue to violate the due process rights of Plaintiffs and Plaintiffs will continue to suffer serious and irreparable harm to their constitutional rights.

### COUNT VI – Article I of the Constitution of New Jersey (Content and Viewpoint Discrimination and Equal Protection) (against all Defendants)

192.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

193.    The Constitution of New Jersey, Article I, Section 6, provides, in pertinent part, that "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." Article I, Section 1 provides, in pertinent part: "All persons are by nature

free and independent, and have certain natural and inalienable rights, among which are those of enjoying and defending life and liberty. . . ."

194.    The New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c) provides, in pertinent part, that "[a]ny person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief."

195.    By engaging in the aforementioned course of conduct under the color of state law, and by causing Plaintiffs to be deprived of its constitutionally guaranteed First Amendment rights, and corresponding rights guaranteed by the New Jersey State Constitution, Article I, Section 6. Defendants have violated the New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c).

196.    Defendants acting under the color of state law have individually and collectively deprived Plaintiffs of constitutional rights in violation of N.J.S.A. 10:6-2(c).

197.    Defendants continued refusal to return Plaintiffs to the Press List and each failure to timely send Plaintiffs a press release, media advisory, or event invitation impacted Plaintiffs' reporting and is a separate and new violation of Plaintiffs rights under the New Jersey Constitution.

### PRAYER FOR RELIEF

198.    WHEREFORE, Plaintiffs respectfully request that the Court:

a.  Enter a permanent injunction requiring Defendants Mayor Steven Fulop, Kimberly Wallace-Scalcione, and The City of Jersey City to restore, and prohibiting Defendants from denying, Plaintiffs' full access to the Press List as provided to similarly situated journalists and news outlets;

b.  Enter a permanent injunction requiring Defendants Mayor Steven Fulop, Kimberly Wallace-Scalcione, and The City of Jersey City to treat Plaintiffs similar to other members of the press and not retaliate or discriminate against Plaintiffs based on the content or viewpoint of their reporting;

c.  Enter a judgment declaring that Defendants Mayor Steven Fulop, Kimberly Wallace-Scalcione, and The City of Jersey City violated constitutional rights with respect to each Count above;

d.  Award Plaintiffs compensatory and nominal damages on all counts;

e.  Award Plaintiffs costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and N.J.S.A. 10:6-2(f); and

f.  Grant such other relief as the Court deems just and proper.

Dated: December 18, 2023                    Respectfully submitted,

                                            */s/ Flavio L. Komuves*
                                            Steven P. Weissman, Esq.
                                            Brett M. Pugach, Esq.
                                            Flavio L. Komuves, Esq.
                                            Weissman & Mintz
                                            220 Davidson Ave., Suite 410
                                            Somerset, NJ 08873
                                            Phone: (732) 563-4565
                                            sweissman@weissmanmintz.com
                                            fkomuves@weissmanmintz.com
                                            bpugach@weissmanmintz.com

Jennifer Borg, Esq.
Media Freedom & Information
Access Clinic
Yale Law School[1]
PO Box 1709
Englewood Cliffs, NJ 07632
(201) 280-5501
Jennifer.borg@yale.edu

*Attorneys for Plaintiffs Aaron Morrill
and The Jersey City Times, LLC*

---

[1] Law Students Amara Banks and Victoria Maras were integral to the research, drafting, and editing of this complaint. The views expressed herein do not purport to represent the institutional views of Yale Law School, if any.

# EXHIBIT A

**JERSEY CITY TIMES**

# While Press Says Otherwise, Crime Is Up Under Mayor Fulop

 by **Aaron Morrill**
May 20, 2021



In June of 2019, *The Wall Street Journal* contained a glowing **article** about the Fulop administration's success in driving down crime.  According to the writer, Fulop had inherited "a tiny police force and outdated and broken crime-fighting tools" but had been able to "drive down violence by hiring more police officers and updating the city's anti-crime technology."

That October, *The Jersey Journal* picked up the story, **reporting** that Jersey City was on track to see "a 50-year low in homicides."

Then in December, *The Wall Street Journal* contained **a second laudatory article**, this one featuring Public Safety Directory James Shea, whom Fulop had hired upon taking office. "Jersey City had a problem with violent crime," said Fulop. He wanted Shea to "turn the situation around." Shea chimed in, "Kind of like New

York had to in the early 90s." Shea and Fulop, said the *Journal*, had brought about "a dramatic improvement" in public safety.

Together, *The Wall Street Journal* and *Jersey Journal* stories painted a compelling picture of an administration that had reformed a badly run police department to bring about unprecedented drops in crime. It was the kind of glowing coverage that a politician dreams of with most of it coming from a world-renowned newspaper.

There was one problem, however. The three stories were largely untrue. Since Mayor Fulop took office, crime overall has gone up, in some areas substantially.

**The Big Picture**

*Jersey City Times* has spent several months pouring over Jersey City crime data compiled by the F.B.I in its **Uniform Crime Reporting (UCR) Program**. Every law enforcement agency in the United States, including the Jersey City Police Department, submits its data to it. The UCR program is, according to Rutgers Associate Professor of Professional Practice Alejandro Gimenez Santana, the "gold standard" of crime statistics.

What emerges from the F.B.I. data is a picture of crime in Jersey City far different from that painted by the administration with help from *The Wall Street Journal* and *The Jersey Journal*. In fact, from 2014, Mayor Fulop's first full year in office, to 2019, the last year that data is available (and the last full year before the pandemic), crime went up by 15.1 percent overall. Violent crime, which includes homicide, aggravated assault, rape, and robbery, increased by almost one percent. Property crime, which includes larceny, auto theft, burglary, and arson—and represents approximately three quarters of all crime in Jersey City—was up by 19.7 percent.


2019 Crime Overall in JC


Violent Crimes
21.5%

On April 29, *Jersey City Times* provided the mayor's spokesperson with the data on which this story is based and asked for comment. We received no response.

However, 13 days after the administration received notice that the publication of this story was imminent, *The Jersey Journal* carried **an exclusive piece** with information provided by the administration purporting to show its success *limiting the rise* in gun deaths from 2019 to 2020. The story repeated an innacurate claim put forth in earlier articles that in 2019 the administration had achieved "a historic low" in homicides.

**A Few Bright Spots In an Otherwise Bleak Landscape**

While crime went up overall from 2014 to 2019, Jersey City did see some reductions. Robbery came down 30.5 percent. Homicide came down 45.8 percent.  Arson—which represents a miniscule .2 percent of overall crime in Jersey City—ended down 70 percent. Burglaries were essentially flat.

These reductions were not enough to make up for big increases in larceny (up 25 percent), automobile theft (up 22 percent) and aggravated assault (up 23.6 percent).



**Unflattering Comparisons**

Jersey City's progress in fighting crime under Mayor Fulop looks even worse when compared to both New Jersey overall to and Newark specifically.

From 2014 to 2019, crime overall went up in Jersey City 15.1 percent. During the same time period in Newark, crime overall fell 42 percent. Indeed, in 2019, Newark *logged fewer total reported crimes*—6,360—than Jersey City did—6,467. From 2014 to 2019, crime also came down statewide 4.3 percent.



Jersey City compared poorly to New Jersey overall when it came to individual crimes and in particular crimes in the largest categories: aggravated assault, robbery, larceny, and motor vehicle theft.





A comparison with Newark is no more flattering.



## A Faux "50-Year Low" in Homicides

On September 30, 2019, the mayor tweeted, "We are on pace for the lowest rate of violent crime/homicides in 50 years." Just days later, *The Jersey Journal* featured an article repeating the mayor's claim. It noted that through September 29, there had been only seven homicides, besting Mayor Jerramiah Healy's record low of 11 homicides for all of 2012.

Then, two months later, the same *Journal* writer penned an article headed "Jersey City sees historic low in homicides in 2019." The mayor, the writer reported, attributed this unprecedented low to "the increase in police officers, an increase in policing



high-crime areas, the cease-fire unit, and the city's revamped surveillance camera system." The writer noted, "There have been 13 homicides with just two days left in the year, the least since 2012 when there were also 13."



Apparently, the writer forgot that in 2012, under Mayor Healy, there were only 11 homicides. Mayor Fulop had not achieved the "historic low"; Healy had. What's more, during the Fulop administration's first six years, the city averaged 21 yearly homicides, exactly what the Healy administration averaged in the preceding six years between 2007 and 2012.

Despite the mayor's repeated claim that homicides reached historic lows under his watch, there had been virtually no progress.

**Not really "kind of like New York…in the early 90s"**

If, as he told *The Wall Street Journal*, Public Safety Director James Shea believed that the job he faced in 2013 was like New York in the early 90s, he hadn't stopped to look at the data. In fact, during the previous six years of the Healy administration, crime overall had come down by 20.7 percent. During this time, Healy had increased the public safety budget by 12 percent and brought it to 20 percent of the entire municipal budget. This was hardly the story of budgetary and management neglect told to the *Journal.*

What's more, if Shea affected a "turnaround," it was in the wrong direction. During the first six years under his watch, crime overall went up 15.1 percent even as the public safety budget increased by $8 million and the city added hundreds of new officers.





Healy was more successful in reducing *both* property and violent crime.\*





\* The violent crime time period was shortened because the Fulop administration failed to provide rape data for 2014.

Healy's reductions can be seen at the individual crime level as well.



## A Great Story at Odds With the Facts

Six months ago, as he delivered his yearly **State of the City address**, Mayor Fulop reprised his falling crime narrative. "We were able to…drive down crime in Jersey City to historic lows as 2019 had the lowest homicide rate we've seen in more than 30 years," he said, adding that "while many cities across the country are seeing increases in violent crime, here in Jersey City we haven't that same trend, and it's largely due to the great work of JCPD."

That no one fact checked him was unsurprising and, perhaps, by design. Two years earlier, **the City stopped posting** crime data on its website.

At the time, the move was met with dismay.

The late Councilman Michael Yun told *The Jersey Journal*, "We pay for that information to be made available to the public, and if it's not, we are not getting the services we pay for. That's not right."

Current "Team Fulop" member and former cop, Councilman Richard Boggiano, told the *Journal*, "This is something that should be on the city website, and I'm shocked. This is ridiculous. You go to some of the city website links, and some of the information is three or four years old and not updated."

Asked for her take, Pamela Johnson, director of the Jersey City Anti-Violence Coalition, was diplomatic but prescient, telling the *Journal*, "I just don't understand why it was done…It's important because we need to know what's going on, and we need to know that the information being shared with the public actually correlates to the data. … I just don't understand the logic in it."

But there may have been a logic in it after all. By limiting access to real time crime data, a message could be crafted more favorable to the administration. Lincoln High School Principal Chris Gadsden sensed that the administration's crime reduction story was questionable, telling *The Wall Street Journal* in 2019, "People in the community still don't feel as safe as the narrative put forth by the city."

It appears the feeling was justified.

**Graphs prepared by Francesca Maniscalco**

© 2023 JCityTimes.com.

Proudly powered by Newspack by Automattic

# EXHIBIT B

# JERSEY CITY TIMES

## Editorial: The Immoral Price of Pompidou

 by **Jersey City Times Staff**
June 9, 2021



There's no denying the appeal of Mayor Fulop's plan, announced Friday, to bring an outpost of the world famous **Pompidou Centre** to Journal Square. As described by the administration **to the New York Times**, Pompidou Jersey City "will be not just a gallery but a multidisciplinary cultural and educational center that could host talks, films and live performances." Who could possible argue with such a project?

The problem with Pompidou Jersey City has nothing to do with the idea. The problem is the cost. Pompidou Jersey City will be expensive, very expensive. And the use of so much money on a cultural project that will cater largely to highly educated, well-heeled residents is simply immoral given the city's myriad needs and vast economic disparities. If ever there was a social justice issue for Jersey Citians to rally around, this is it.

Many of the details have yet to be ironed out, but we do know enough to estimate the costs. First, there's the

$10 million already spent to acquire the Pathside Building where the museum will be built. Then, there's the $10 to $20 million the mayor told *The New York Times* that renovations will cost. That's $30 million just to turn the lights on. And, of course, as with any project, you can expect overruns.

Then there's the cost of operating the place: It's going to be a small fortune. For example, operating expenses at Montclair Art Museum are $5 million a year. The highly regarded Newark Museum costs $15 million a year to run. Because ticket sales amount to very little, both rely heavily on government support and endowments, the latter of which Pompidou Jersey City won't have to draw on. Indeed, in 2019, the Newark Museum actually lost money even though it has a $41 million endowment.

But let's assume that Pompidou Jersey City would cost only $6 million a year to run as the mayor told *The Jersey Journal*. With no endowment, it will rely almost exclusively on government support. That means Jersey City taxpayers will be footing the bill.

But wait. As Lasvignes might say, here's the pièce de résistance.

According to *The Times,* Mayor Fulop has committed Jersey City to pay Pompidou up to $6 million a year "to cover project development, branding, educational programming and the organization of exhibitions."

Yes, you heard right: That's $6 million on top of operating expenses of $6 million for a total of $12 million a year stretching into the future.

How much is that in relation to Jersey City's other outlays? It's more than the city's budget for Health and Human Services ($4.6 million) and Parks and Recreation ($3 million) combined.

That's worth repeating: The proposed Pompidou museum in Journal Square will cost more money than Jersey City spends on Health and Human Services and Parks and Recreation combined.

Jersey City has a list of needs a mile long. Many of our schools are decrepit. McNair Academic High School suffers from regular flooding and insect infestations. An **article this week** pointed out that many of our schools lack the necessary wiring to support the air conditioners bought by parents.

The city has unmet environmental needs. As **we wrote last year**, Jersey City's tree canopy has shrunk to alarming levels, exposing many of its most vulnerable residents to "**heat islands**" which, as the **New York Times pointed out**, can have dire negative health effects on people living within them.

And then, perhaps most importantly, there is poverty and crime. **Our research** has shown that crime has been

rising in Jersey City, driven by poverty and the hopelessness that so many of our youth feel. Yet since 2013, as luxury condominiums have grown up like weeds in an abandoned lot, ground has not been broken on a single recreation center. Some blocks have been overrun by drug-selling gangs, leaving residents cowering indoors for safety. Homelessness and hunger remain major problems.

The human needs in Jersey City are vast. If the mayor is serious about moving Jersey City forward, he must commit to moving everyone forward.

Mayor Fulop deserves credit for his support of the arts and his appreciation for the contribution they make to a vibrant city. At about $1 million a year, the recently enacted taxpayer supported arts trust fund, which the mayor helped bring about, is an example of an affordable way to support the arts. Indeed, as the mayor often reminds people, it's more than most cities have done.

And the mayor is right to focus on the redevelopment of Journal Square with its vast potential. But that development is already taking place.

Finally, Jersey City doesn't need Pompidou to realize its artistic potential. In 2011, *before* Steve Fulop took office, Jersey City was ranked by *Atlantic Magazine* as the 10th most artistic city in America.  Since then, Mana Contemporary and numerous independent galleries and studios have sprouted up across the city further cementing its arts bona fides. Neither Williamsburg nor Bushwick Brooklyn had to fork over countless millions to become hip and artsy.

According to *The Times*, the Centre Pompidou previously looked at other North American cities, including Chicago, but none of those plans ever "came to fruition." Having now looked at the numbers, it's not hard to see why those cities took a pass.

*Update: A July 28, 2023 report by New Jersey Senate Republicans found the museum may end up costing in excess of $200 million. The state, said the report, has already appropriated $58 million in taxpayer dollars for the project without oversight. $33 million will be paid directly to the Pompidou museum in Paris. Thirty "no-bid" consultants are to receive more than $40 million as "soft-costs" on the project, says the report. On May 10, the Jersey City Municipal Council voted to issue $57 million in "special emergency notes" to close a $57 million budget deficit.*

# EXHIBIT C

**JERSEY CITY TIMES**

# Mayor Travels in Secret to Paris with Council Members and Department Heads

 by **Aaron Morrill**
February 22, 2023



Mayor Fulop has taken a group, which includes council members and city department heads, to Paris to meet with officials of the Pompidou Museum.

In June of 2021, Fulop announced a plan to build a $40 million satellite of the famed museum in the Pathside Building at Journal Square. The mayor has argued that the Jersey City satellite, to be called "Pompidou x," will attract visitors from around the region, spur development, and elevate Jersey City's profile in the art world.

News of the trip was apparently limited to a small group of City Hall insiders. The Jersey City Times learned about it from several sources who asked to remain anonymous. According to one source, the trip was privately funded.

Council President Joyce Watterman, Ward B Councilwoman Mira Prinz-Arey, Director of Cultural Affairs Christine Goodman, Business Administrator John Metro, and Housing, Economic Development and Commerce Director Annisia Cialone are in the group, according to a source.

It is believed that the group will be returning tonight or tomorrow morning. The mayor reportedly has planned a fundraiser tomorrow night for his expected gubernatorial run.

Asked about the trip, Ward F Councilman Frank Gilmore said that he had not been told about it but noted that both Watterman and Prinz-Arey missed last night's caucus meeting. "If the trip was privately funded, I'd like to know who paid for it," he said.

Councilman Richard Boggiano, in whose ward Pompidou x would be located, said he learned about the trip only yesterday.

This isn't the mayor's first secret trip to Paris in connection with Pompidou x. In the fall of last year, the Jersey City Times learned that the mayor had travelled to Paris with Goodman.

In response to an Open Public Records Request filed by the Times seeking information on the trip, mayoral spokesperson Kimberly Wallace-Scalcione told the paper, "There are no responsive documents to your OPRA request as no taxpayer dollars were used in any way."

In June of last year, the Times reported that Charles Kushner, the developer of the massive One Journal Square apartment complex next door to the planned museum, had given Fulop the initial idea of partnering with the French museum.

While the plan for Jersey City has been greeted warmly by some, and while the state of New Jersey has agreed to kick in $24 million toward the project, some artists and activists have questioned both the need for the museum and the wisdom of burdening Jersey City with the cost of building and running the institutution.

The memorandum of understanding with Pompidou, approved by the City Council in June 2021, calls for the city to pay Pompidou $6 million per year for five years in exchange for project development, branding, educational programming, and organizing exhibitions. Annual operating expenses and costs for shipping and insuring art sent from France, which aren't included in the $6 million already agreed to, could more than double that number. In 2019, the smaller Montclair Museum had total expenses of $5 million.

At a City Council meeting that year, then Councilman-at-large Rolando Lavarro asked Mayor Fulop about operating costs. Fulop responded, "There will be some additional cost. … We have some ranges on that which

we're pretty comfortable with based upon what's happened with other museums. …We've done a lot of research around that, and I'm happy to get you some of that information."

Two years later, the mayor has yet to produce the promised budget.

© 2023 JCityTimes.com.

Proudly powered by Newspack by Automattic

# EXHIBIT D

# Non-profit arm of Jersey City EDC paid for 8 officials to travel to Paris, mayor says

By **John Heinis** - March 8, 2023 5:11 pm

The non-profit arm of the Jersey City Economic Development Corporation paid for eight officials to travel to Paris as part of the Centre Pompidou project in Journal Square, Mayor Steven Fulop said today.

" … Who paid for it? That's an important question. As I said earlier, not a single dollar of taxpayer dollars went towards this," the mayor said in an interview in his office this morning.

"In the EDC, the Economic Development Corporation in Jersey City, during COVID we established a fund based on private dollars to keep economic development going and support the city during COVID and post-COVID around economic development initiatives. We raised millions of dollars, we were transparent about that, and there's a couple hundred thousand dollars left to focus on economic development … that's the funding source."

He identified the non-profit as Grow Jersey City, which is modeled after Choose New Jersey, according to their website. GJC did not have any public filings available online as of this afternoon.

Fulop said the administration was transparent around the trip, which lasted from February 18th to February 22nd for most, though only from the 20th through the 22nd for the mayor, information that was found in the itinerary, which HCV first published.

The mayor insisted that "misinformation" around the trip came from the Jersey City Times, who first published a story about the trip citing anonymous sources, who he repeatedly referred to as a blog run by "a trust fund baby that's kind of been lost for a long time trying to find his way."

He also referred to an JCT advisory board member as "a failed perennial candidate for office" who has been unsuccessful in every avenue he's pursued.

Additionally, Fulop said that City Hall always responds to "legitimate news outlets" when they have an inquiry, but aren't going to waste time trying to fight with blogs that

consistently put out inaccurate material.

Furthermore, he said that it was not really "a junket" or vacation since it was work based, centering around developing the Centre Pompidou project which is slated to open in late 2025 or early 2026.

Fulop indicated that he didn't have an exact dollar or estimate for what the trip cost, but noted that everyone flew coach and stayed in a hotel near the Centre Pompidou-Metz. He also said he was open to releasing receipts pertaining to the trip.

"This is as vital to Journal Square as a project as anything that we have, actually vital to New Jersey," he added.

JCT Published and Editor-in-Chief Aaron Morrill said that they stand by their reporting and plan on continuing to cover stories of public interest like this one.

"For a failed blogger, I certainly seem to have succeeded in getting under the mayor's skin. Similar to bullies like Trump, the mayor prefers to call journalists names rather than address the issues," he stated.

"The mayor failed to point out a single inaccuracy in our reporting, of which I am very proud. We will continue to shine a light on the administration notwithstanding the mayor's efforts to keep the public in the dark."