Steven P. Weissman, Esq.
Flavio L. Komuves, Esq.
Brett M. Pugach, Esq.
Weissman & Mintz
220 Davidson Ave., Suite 410
Somerset, N.J. 08873
Phone: (732) 563-4565
sweissman@weissmanmintz.com
fkomuves@weissmanmintz.com
bpugach@weissmanmintz.com

Jennifer Borg, Esq.
Media Freedom & Information Access Clinic
Yale Law School
PO Box 1709
Englewood Cliffs, NJ 07632
(201) 280-5501
Jennifer.Borg@yale.edu

*Attorneys for Plaintiffs Aaron Morrill and*
*The Jersey City Times, LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| AARON MORRILL and THE JERSEY CITY TIMES, LLC, | Civil Action No. 2:23-cv-23197-ES-JSA |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| v. | |
| STEVEN M. FULOP, in his individual and official capacities, KIMBERLY WALLACE-SCALCIONE, in her individual and official capacities. | |
| Defendants. | |

## COMPLAINT

Plaintiffs Aaron Morrill and The Jersey City Times, LLC (publisher of the *Jersey City Times*, both interchangeably referred to as "*JCT*"), 64 Wayne St., Jersey City, New Jersey 07302 for their complaint against Defendants Steven M. Fulop (280 Grove Street, Second Floor, Jersey City, N.J. 07302) and Kimberly Wallace-Scalcione (280 Grove Street, Second Floor, Jersey City, N.J. 07302), allege, by and through their attorneys, as follows:

## INTRODUCTION

1.     The right to question and criticize public officials is essential to a healthy democracy, as is a robust, free, and independent press. And yet, when faced with critical reporting by a local news publication, Steven M. Fulop, the mayor of the City of Jersey City ("Jersey City" or "City"), and Kimberly Wallace-Scalcione, press secretary, acting under color of law and acting in concert or alone, punished the publication and its editor by engaging in a policy, practice, proclamation, custom and/or edict of viewpoint and content-based discrimination and retaliation that has continued for several years. After Plaintiffs published a story critical of the mayor, Defendants immediately removed Plaintiffs from the City's press email distribution list (the "Press List") and ceased all communications with Plaintiff. After being contacted by Plaintiffs' attorneys, Defendants started to send Plaintiffs some emails but continued to exclude them from invitations to press conferences and other press events. Such retaliation against protected speech is anathema to the First Amendment and threatens to stifle the free flow of information upon which our democracy depends.

2.     Plaintiff Aaron Morrill is founder and editor-in-chief of the *Jersey City Times*, a news publication which covers news in Jersey City. *JCT*'s reporting on local issues depends, in large part, on receiving information and invitations via the Press List—a list of media and

community organizations that receive regular email communications from the Jersey City mayor's office. These communications—which include press releases, media advisories, and invitations to press conferences—allow news organizations to timely report on breaking stories and other matters of public interest to City residents and businesses.

3.      When it was founded in 2019, *JCT* was added to the Press List and routinely received Press List emails. That came to an abrupt end when, on May 20, 2021, *JCT* published an article written by Mr. Morrill that disputed Mayor Fulop's characterization of crime statistics in Jersey City (the "May 20, 2021 Article"). The May 20, 2021 Article disputed Mayor Fulop's statements that crime in Jersey City had decreased and explained that crime in the City had actually increased. Rather than contacting *JCT* to dispute the reporting or to request a correction, Mayor Fulop and the City's press secretary, Kimberly Wallace-Scalcione, retaliated against Plaintiffs by abruptly and selectively removing them from the Press List without any prior notice or explanation.

4.      As a result, Plaintiffs were not able to timely report on news of public interest to their readers and, in many instances, they were not able to report on current events at all. Defendants' actions infringe Plaintiffs' constitutional rights and deprive *JCT*'s readers of vital and timely reporting on matters of public interest.

5.      In May and July of 2021, Plaintiff Morrill made repeated requests on behalf of both himself and *JCT* to be added to the Press List but he never received a response from Defendants. It was only after counsel for Plaintiffs contacted Defendants' attorneys informing them that Defendants were violating Plaintiffs' constitutional rights that attorneys for Defendants stated in April of 2022 that *JCT* would be "added to the list."

6.     Plaintiffs were not, in fact, "added to the list." From the time the May 20, 2021 Article was published up until the date this lawsuit was filed, Plaintiffs did not receive a single invitation to a press conference or other press event including, but not limited to, groundbreakings, ribbon-cuttings, commemorations, and swearing-in ceremonies ("Press Events"). Yet, other members of the press, including Plaintiffs' local competitors and national news organizations continued to be invited to Press Events.

7.     In some instances, the invitations were emailed to over two hundred (200) news organizations including those which rarely cover Jersey City. Plaintiffs' ability to report on Jersey City is significantly impaired each time Defendants fail to invite them to Press Events.

8.     It was only after the initiation of this lawsuit that Defendants started to send invitations to Press Events to Plaintiffs. It is not known if Plaintiffs have been fully restored to the Press List and are receiving notices of all Press Events or whether they are receiving all the emails and invitations that are widely distributed to other news organizations and journalists.

9.     Defendants can reasonably be expected to continue to retaliate or otherwise interfere with Plaintiffs' constitutional rights based on Defendants' prior conduct and obvious animus towards Plaintiffs. Defendants have never acknowledged that they removed Plaintiffs from the Press List nor have they acknowledged that Plaintiffs have been fully restored to it. Defendants started sending invitations to Plaintiffs for Press Events only after Plaintiffs initiated this litigation.

10.    Defendants' actions infringe Plaintiffs' constitutional rights to access and receive information, to speak and listen, to gather news and information and to be free from retaliation for criticizing Mayor Fulop and his administration.

11.     Defendants have engaged in unlawful retaliation; have violated Plaintiffs' Fourteenth Amendment equal protection rights, First Amendment equal access rights, and analogous rights under the New Jersey State Constitution; have engaged in viewpoint and content-based discrimination; and have violated Plaintiffs' due process rights.

12.     By removing Plaintiffs from the Press List and failing to invite them to Press Events, Defendants are punishing Plaintiffs and attempting to influence the content and tenor of news reporting. Defendants' actions seek to impede professional and investigative journalism and silence criticism. These actions are all unconstitutional.

13.     Defendants' continued refusal to actually return Plaintiffs to the Press List over a two-year period and each failure to invite them to a Press Event impacts Plaintiffs' reporting and is a separate and new violation of Plaintiffs' rights under the United States Constitution and New Jersey Constitution.

14.     Through this lawsuit, Plaintiffs seek to compel Defendants to fully restore them to the Press List; invite Plaintiffs to all Press Events, provide Plaintiffs with information and access on the same basis as other news organizations and journalists; and, ensure that the press remains free to criticize and question the government of Jersey City.

## **PARTIES**

15.     Plaintiff Aaron Morrill, a resident of Jersey City, New Jersey, is founder and editor-in-chief of the *Jersey City Times*. Mr. Morrill founded *JCT* to provide reliable and informative news focused solely on Jersey City.

16.     Plaintiff The Jersey City Times, LLC is a news organization, formed in Jersey City on June 24, 2019. It publishes an online newspaper, the *Jersey City Times*. Its principal place of business is 64 Wayne Street, Jersey City, New Jersey 07302. The *Jersey City Times*'s

mission is to provide credible, community-based, public-service journalism, focused solely on Jersey City. *JCT* is dedicated to high-quality, in-depth coverage of Jersey City's people, neighborhoods, government, schools, businesses, culture, and cuisine. It is a news publication which covers news in Jersey City.

17.     Defendant Steven M. Fulop is the mayor of Jersey City. He is sued in his individual and official capacities. He maintains a place of business at 280 Grove Street, Second Floor, Jersey City, New Jersey 07302. The mayor is the chief executive of the City and appoints the heads of the various departments in the city and other municipal boards and commissions. The mayor's office supervises, directs, and controls all departments of the City government including, upon information and belief, the Press Office. Mayor Fulop is a decision-maker possessing final authority to establish municipal policies, proclamations, practices, customs and/or edicts.

18.     Defendant Kimberly Wallace-Scalcione is the press secretary for the office of the mayor of Jersey City and her department is listed on the City's website as "Press Office." She is sued in her individual and official capacities. Among other duties, Ms. Wallace-Scalcione is responsible for distributing communications of the mayor's office through the Press List and maintains that list. As the chief "spokesperson" for the City, Ms. Wallace-Scalcione serves as a liaison between the press and City officials, including Mayor Fulop. She maintains a place of business at 280 Grove Street, Second Floor, Jersey City, New Jersey 07302. Ms. Wallace-Scalcione is a decision-maker possessing authority to establish policies, proclamations, practices, customs, and/or edicts with respect to the Press List and/or communications of the mayor's office.

19.     At all relevant times, Mayor Fulop and Press Secretary Wallace-Scalcione as well as their agents, employees, officers, and representatives, have acted under color of state law in establishing, authorizing, implementing, adopting, ratifying, and/or enforcing the policies, practices, proclamations, custom and/or edicts relating to the Press List and/or the mayor's office.

## JURISDICTION AND VENUE

20.     This is an action brought pursuant to 42 U.S.C. § 1983 to redress the deprivation of rights secured by the First and Fourteenth Amendments to the United States Constitution.

21.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

22.     This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

23.     Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Plaintiffs' related claims arising under state law, namely Article I of the Constitution of New Jersey and the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.

24.     Venue is proper for the New Jersey District Court pursuant to 28 U.S.C. § 1391(a), (b), and (c). The parties reside in this district, and a substantial part of the events giving rise to the claims occurred in this district.

## FACTS

25.     Plaintiff Aaron Morrill is founder and editor-in-chief of the *Jersey City Times*.

26.     *JCT* is a news publication which covers news in Jersey City. Since its founding in 2019, it has become a trusted source for local news. Its articles have been cited by *Politico New Jersey*, the *New Jersey Monitor*, the *Kansas City Star*, the *Jersey Journal*, the *Hudson County*

*View*, and others. The site receives 40,000-60,000 unique visitors each month. The majority of *JCT*'s reporters and advisory board members are professional journalists who have written for other news publications, and many have journalism degrees. *JCT* is a member of the New Jersey Press Association and the Local Independent Online News Publishers organization; many of its writers hold press passes.

### The Press List

27.    Upon information and belief, the City's press office maintains the Press List—a list of email addresses of journalists and news organizations to which it regularly sends press releases, media advisories, and invitations to various City and press-related events.

28.    By being removed from the Press List and by not being invited to Press Events, Plaintiffs have effectively been deprived of access to press conferences and other press events. They cannot attend a press conference or other press event if they don't know it is being held. Their newsgathering and reporting about fast-developing and important news stories are significantly hampered and chilled causing harm not only to them but to their readers who rely on them as an essential news source. This problem is compounded when competitors are included on the Press List and are able to cover events and publish timely stories before organizations not on the Press List, like *JCT*, even learn of the events.

29.    Once Defendants decide to hold a press conference or other Press Event, they cannot deny access for arbitrary, retaliatory or discriminating reasons. It is well-settled and clearly established that Defendants cannot provide notice of Press Events to other news organizations and journalists while not providing similar notice to Plaintiffs without a rational basis for the difference in treatment. Defendants have no objective criteria for determining who gets invited to press conferences or other Press Events nor have they provided Plaintiffs with

their reasons for no longer including them. Procedural due process requires both notice to Plaintiffs and an opportunity for them to explain why they are entitled to be invited to Press Events. By not inviting Plaintiffs to Press Events on the basis of their protected speech and not providing them with due process, Defendants are engaging in unlawful conduct.

30.     On December 4, 2019, the then-editor-in-chief of *JCT*, Dan Levin, emailed Ms. Kimberly Wallace-Scalcione with a request to be put on the Press List. That same day, Press Secretary Wallace-Scalcione agreed, stating: "Yes absolutely. Thanks for reaching out. If you and/or your team ever want to meet for coffee to talk shop I'd be happy to plan a day. The Jersey City times [sic] reporters I've met so far are fantastic to work with."

31.     Plaintiffs were subsequently added to the Press List with the email address of editor@jcitytimes.com. Between December 4, 2019, and May 19, 2021, Plaintiffs received at least 185 press releases and media advisories from Press Secretary Wallace-Scalcione via the Press List.

32.     Upon information and belief, a media advisory is sent when the City is inviting the press to an event such as a press conference and a press release is used to relay news about the City or the government that may be of interest to the press and its readers.

33.     Defendants have never published or informed Plaintiffs of any criteria or standards explaining which news organizations are included in, or permitted to remain on, the Press List or any criteria or standards explaining who gets invited to Press Events.

***Plaintiffs' Critical Reporting, Resulting Animus, and Removal from the Press List***

34.     On May 20, 2021, *JCT* published the May 20, 2021 Article—a story critical of Mayor Fulop, disputing his characterization of crime statistics. Aaron Morrill, *While Press Says*

*Otherwise, Crime Is Up Under Mayor Fulop*, Jersey City Times (May 20, 2021) (attached hereto as **Exhibit A**).

35.    The May 20, 2021 Article—authored by Plaintiff Morrill—analyzed FBI data to explain that, despite *The Wall Street Journal* and *The Jersey Journal* stories that claimed Mayor Fulop's administration had successfully reduced violent crime, crime in Jersey City had gone up overall in the years since Fulop's election. The May 20, 2021 Article also debunked Mayor Fulop's repeated claims that Jersey City homicides had reached historic lows, reporting, instead, that "there had been virtually no progress" in homicide reduction.

36.    The day the May 20, 2021 Article was published, a reporter at another local news organization asked Press Secretary Wallace-Scalcione whether he could "get something to dispute" *JCT*'s reporting that "crime is up in Jersey City." Press Secretary Wallace-Scalcione forwarded that email to Mayor Fulop with her proposed response accusing *JCT* of pursuing an "unethical misinformation campaign," "deceiving the public for the benefit of their personal agenda against this administration," and publishing "despicable lies."

37.    Press Secretary Wallace-Scalcione wrote back to the reporter, stating "The JC Times has consistently misrepresented information, and they don't hide their political agenda against the Mayor. To be clear, It [*sic*] is run by a perennial failed political candidate in Dan Levin that has run against the Mayor as part of the previous Mayor's team, and his financial benefactor Aaron Morrill who also has been a vocal political supporter of the Mayor's opposition. We don't respond to their blog because it is simply not a legitimate news source."

38.    On or shortly after May 20, 2021, Plaintiffs stopped receiving any emails from the press office.

39.     Defendants provided no notice to Plaintiffs that they were being removed from the Press List nor did they provide any explanation as to why Plaintiffs were removed.

40.     On or about May 24, 2021, after becoming aware that Plaintiffs were removed from the Press List, Plaintiff Morrill wrote to Press Secretary Wallace-Scalcione asking if Plaintiffs had inadvertently been left off the Press List.

41.     Mr. Morrill received no response.

42.     On June 9, 2021, *JCT* published an editorial that criticized Mayor Fulop's plan to bring an outpost of the Pompidou Center to Jersey City: "The use of so much money on a cultural project that will cater largely to highly educated, well-heeled residents is simply immoral given the city's myriad needs and vast economic disparities." Aaron Morrill, *Editorial: The Immoral Price of Pompidou*, Jersey City Times (June 9, 2021) (attached hereto as **Exhibit B**).

43.     Shortly thereafter, in an email to a Jersey City resident on June 11, 2021, Mayor Fulop referred to *JCT* as "yellow journalism" and stated that he did not "put much into []JcTime" or "onejc" because they were "both run by Dan Levin and Aaron Morrill who are failed candidates at length and consistently push outright lies."

44.     "One JC" was a Facebook group operated by *JCT*'s former editor-in-chief, Dan Levin.

45.     On June 15, 2021, the chief marketing officer of AeroFarms, a local vertical farming company, reached out to Stacey Flanagan, Jersey City's director of health and human services, to ask whether Liz Morrill, Plaintiff Morrill's wife and a *JCT* reporter, who had asked him a number of questions about AeroFarms' collaboration with the City, was "a 'friendly.'" Ms. Flanagan responded that "I do not believe JC Times is friendly."

46.     In the same email thread, also on June 15, 2021, Press Secretary Wallace-Scalcione explained that "we do not engage at all with the JC Times. They are a completely bias [*sic*] blog with very little readership and not a real news outlet."

47.     In response to Press Secretary Wallace-Scalcione's email, also on June 15, 2021, Mayor Fulop added, of *JCT*, that "[t]here is no benefit to engaging them IMO as it will not change what they are writing."

48.     On June 24, 2021, Mayor Fulop wrote, in an email to the executive director of a nonprofit supporting the visual arts, that an editorial written by *JCT* was "yellow journalism by two miserable people in Dan levin and Aaron morril [*sic*], Very little of what they write is factual on most subjects and they use that jc times [sic] as a political tool to hurt me. Dan Levin Ran [*sic*] for council and mayor with my predecessor and Aaaron [*sic*] is his best friend. Not worth the time on a response."

49.     In an email sent on June 29, 2021, Mayor Fulop referred to Mr. Levin and Mr. Morrill as "as big hacks as they come" and again referred to a critical story as "yellow journalism." When the person asked whether a lot of people read *JCT*, the mayor responded: "No. Very little."

50.     On July 21, 2021, after months of being removed from the Press List and having not received any emails whatsoever from the mayor's office, Mr. Morrill emailed Press Secretary Wallace-Scalcione and copied the mayor reminding them that they had not responded to his May 24, 2021 email questioning why *JCT* had not received a press release. He stated that *JCT* had not received any of the 15 press releases that they had sent out to the media since May 17, 2021 and that it was not invited to at least one Press Event that had been held.

51.     Notably, Mr. Morrill also wrote: "Actions that have the effect of chilling vigorous reporting by the press strike at the very heart of the First Amendment to the Constitution of the United States. We will be discussing our legal options with counsel. In the meantime, it is my sincere hope that you and the mayor will reverse this ill-advised, and quite possibly illegal, policy."

52.     Press Secretary Wallace-Scalcione forwarded Mr. Morrill's email to the mayor that very same day stating, in relevant part: "JC Times says they are 'discussing our legal options with counsel'. Please see their full email below. I will not respond unless you say otherwise." Defendants did not respond.

53.     On July 23, 2021, Casey Georgi, then a *JCT* reporter, emailed Press Secretary Wallace-Scalcione asking for comment on an upcoming story about the administration's failure to respond to *JCT*'s OPRA requests and the fact that *JCT* was "no longer receiving . . . press releases and invitations to press events."

54.     That same day, Press Secretary Wallace-Scalcione forwarded Ms. Georgi's email to Mayor Fulop, stating, in relevant part: "I won't comment unless you say otherwise." Ms. Georgi received no response.

55.     In a letter dated April 7, 2022, attorneys representing Plaintiffs wrote to the City's attorney, objecting to Plaintiffs' removal from the Press List, and City officials' refusals to respond to requests for comment from *JCT* reporters.

56.     The six-page letter informed Defendants that they were violating Plaintiffs' First and Fourteenth Amendment rights as well as their due process rights and that Defendants were engaging in unlawful First Amendment retaliation and discrimination. The letter included case law and facts obtained from public records requests supporting its legal claims and requested that

Defendants immediately return *JCT* to the Press List and resume responding to requests for comment from *JCT*'s reporters. The letter requested that the City attorney respond by no later than April 15, 2022.

57.    The City attorney did not respond to the April 7, 2022 letter.

58.    On April 24, 2022, Plaintiffs' attorneys sent a follow up email to the City's attorney, John McKinney, again requesting that the City reinstate Plaintiffs to the Press List especially since to do so would require a "*de minimus* amount of time and effort and would obviate the need to waste taxpayers' dollars further addressing this issue." Plaintiffs' attorney further requested knowing the City's position by April 27, 2022.

59.    On April 25, 2022, the City's attorney responded to Plaintiffs' attorneys, stating that he "believe[d] the 'editor' account was added to the list." He further added that Press Secretary Wallace-Scalcione had informed him that "no press releases have gone out lately since the account was added to the list."

60.    But Plaintiffs were actually not added to the "list." Although Plaintiffs started receiving some emails from Defendants, they did not receive a single email inviting them to Press Events. Rather, they only received emails about Press Events after the events occurred.

61.    At 12:15 p.m. on April 26, 2022, Press Secretary Wallace-Scalcione sent a media advisory inviting over 200 members of the press to the nation's largest immigration conference. At 4:34 p.m.; 4:35 p.m.; 4:38 p.m.; and 4:53 p.m. she sent this very same media advisory to additional news organizations. Plaintiffs did not receive this media advisory and were not invited to the event even though Press Secretary Wallace-Scalcione took the time to send the very same email out four (4) separate times that day to multiple members of the press each time. Because Plaintiffs had no prior notice of the event they could not attend and report on it.

62.     Defendants were clearly making calculated and concerted efforts to give other members of the press advance notice of Press Events while deliberately and maliciously omitting Plaintiffs from their communications. Despite Defendants' attorneys' assurances in their April 25, 2022 email to Plaintiffs' counsel that Defendants had a single "list" and that Plaintiffs would be "added" to it, that representation turned out to be false. Defendants continued their unlawful conduct by not sending Plaintiffs a single invitation to a Press Event.

63.     On April 27, 2022, Press Secretary Wallace-Scalcione emailed the *Daily Wire* the same media advisory about the immigration conference that she sent to news organizations on April 26, 2023. However, the *Daily Wire* rarely, if ever, covers Jersey City. Plaintiffs did not receive this media advisory and were not invited to the event. Because Plaintiffs had no prior notice of the event they could not attend and report on it.

64.     On May 2, 2022, Press Secretary Wallace-Scalcione sent a media advisory inviting the local press to a cancer campaign event. Plaintiffs did not receive this media advisory and were not invited to the event. Because Plaintiffs had no prior notice of the event they could not attend and report on it.

65.     On May 2, 2022, Press Secretary Wallace-Scalcione emailed a media advisory inviting the press to an event where the mayor and council would unveil a retractable roof over a public pool. Plaintiffs did not receive this media advisory and were not invited to the event. Because Plaintiffs had no prior notice of the event they could not attend and report on it.

66.     On May 4, 2022, Press Secretary Wallace-Scalcione emailed the press release about the retractable roof to additional news organizations. Plaintiffs did not receive this press release and were not invited to the event. Because Plaintiffs had no prior notice of the event they could not attend and report on it.

67.     On May 5 and 6, 2022, Ms. Wallace-Scalcione sent a media advisory inviting the press to a press conference concerning fallen police officers. Plaintiffs did not receive this media advisory and were not invited to the event. Because Plaintiffs had no prior notice of the press conference they could not attend and report on it.

68.     Plaintiff Morrill knew from reading other publications that other members of the press were invited to and writing about Press Events to which neither he nor *JCT* had been invited.

69.     Accordingly, on May 6, 2022, Plaintiffs' attorneys emailed the City's attorney to confirm whether Plaintiffs had, in fact, been added back to the Press List.

70.     On May 17, 2022, Mr. Jeremy Jacobsen, assistant corporation counsel to the City, emailed Plaintiffs' attorneys stating that he had confirmed with Press Secretary Wallace-Scalcione that "there was not actually a press release sent yesterday." He added: "My understanding is that your client should be included and see the next one that is sent though. Our press secretary will be out next week, so that may not be until the following week."

71.     Despite the City attorneys' representation once again that Plaintiffs would be restored to what they described as the "list," Plaintiffs were not invited to a single Press Event from the time the May 20, 2021 Article was published to the date this lawsuit was filed. Yet, the entire local press corps, and often the metropolitan New York press corps, along with media that rarely, if ever, covers Jersey City were consistently being invited to Press Events.

72.     On May 19, 2022, Press Secretary Wallace-Scalcione emailed a media advisory inviting the press to an active shooter drill. Plaintiffs did not receive this media advisory and were not invited to the event. Because Plaintiffs had no prior notice of the event they could not attend and report on it.

73.     On October 26, 2022, Press Secretary Wallace-Scalcione emailed members of the press a statement from the mayor regarding crime reductions. Plaintiffs did not receive this email.

74.     On November 21, 2022, at 11:51 a.m., Press Secretary Wallace-Scalcione sent a media advisory inviting over 200 members of the press to attend a ceremony promoting various police officers to be held on November 22. Plaintiffs did not receive the media advisory and were not invited to the event. On November 22 at 2:11 p.m. after the event took place, Press Secretary Wallace-Scalcione sent a press release about the event. Because Plaintiffs had no prior notice of the event they could not attend and report on it.

75.     On November 23, 2022, Press Secretary Wallace-Scalcione sent a press release regarding the award for the "Municipal Project of the Year" and inviting the press to attend the ceremony. Plaintiffs did not receive the press release and were not invited to the ceremony. Because Plaintiffs had no prior notice of the ceremony they could not attend and report on it. Plaintiffs only received the press release on November 23, 2022, after the event had already concluded.

76.     On November 28, 2022, Press Secretary Wallace-Scalcione sent a media advisory to over 200 members of the press inviting them to an event where the mayor would announce the promotion of the City's first female deputy fire chief. Plaintiffs did not receive the media advisory and were not invited to the event. Because Plaintiffs had no prior notice of the event they could not attend and report on it. Plaintiffs received a press release on November 29, 2022 after the event had concluded.

77.     On December 16, 2022, Press Secretary Wallace-Scalcione sent a media advisory inviting over two hundred members of the press to the mayor's end of the year review of crime

and public safety where city officials would answer reporters' questions. This media advisory was sent again on December 19 to an unknown number of news organizations. On December 20, 2022, Press Secretary Wallace-Scalcione emailed various reporters thanking them for attending and attaching graphics to accompany their stories. Plaintiffs were not invited and did not receive any of the media advisories. Because Plaintiffs had no prior notice of the event they could not attend and report on it.

78.     On February 7, 2023, Press Secretary Wallace-Scalcione emailed a press release regarding animal cruelty to over two hundred members of the press. Plaintiffs did not receive this press release.

79.     Defendants' continued refusal to actually return Plaintiffs to the Press List and each failure to invite them to a Press Event impacts their reporting and is a separate and new violation of Plaintiffs' rights under the United States Constitution and New Jersey Constitution.

***Mayor Fulop's Animus Towards Plaintiffs Continues***

80.     Defendants' animus towards Plaintiffs is further demonstrated by Mayor Fulop's public response to a February 22, 2023 article by *JCT*. On that date, *JCT* ran a story by Plaintiff Morrill that described a trip Mayor Fulop took, along with City Council Members and department heads, to Paris to meet with Pompidou Museum officials. The story was critical that the trip not widely publicized, and thus appeared secretive. Aaron Morrill, *Mayor Travels in Secret to Paris with Council Members and Department Heads*, Jersey City Times (Feb. 22, 2023) (attached hereto as **Exhibit C**).

81.     In an interview with the *Hudson County View*, published on March 8, 2023, Mayor Fulop alleged that "misinformation" surrounding the Paris trip had originated with "misleading, non-factual" reporting by *JCT*. In this interview, Mayor Fulop repeatedly referred

to *JCT* as a "blog" and said that it was run by "a trust fund baby that's kind of been lost for a long time trying to find his way and established [*JCT*] because he's never been successful at anything else."

82.    In that interview, Mayor Fulop conceded that he treats *JCT* differently than other news organizations by stating that he provides information to "legitimate news sources," but that it's a waste of time to engage with "blogs that repeatedly promulgate misinformation or anonymous sources." John Heinis, *Non-profit arm of Jersey City EDC paid for 8 officials to travel to Paris, mayor says*, Hudson County View (Mar. 8, 2023) (attached hereto as **Exhibit D**).

### Defendants Unlawful Conduct Towards Plaintiffs Continues

83.    On March 1, 2023, Press Secretary Wallace-Scalcione emailed a media advisory at 11:43 a.m. inviting the press to attend a press conference regarding a major affordable housing development—the Holland Gardens complex. She also sent this same media advisory again at 11:44 a.m. to numerous additional news organizations. Plaintiffs did not receive the media advisory and were not invited to the event. Because Plaintiffs had no prior notice of the press conference they could not attend and report on it.

84.    On March 2, 2023, Press Secretary Wallace-Scalcione emailed a reminder media advisory to the press reminding them of the press conference regarding the Holland Gardens complex and emailed a competitor of Plaintiffs inquiring if they would be attending. Plaintiffs did not receive this reminder. Because Plaintiffs had no prior notice of the press conference they could not attend and report on it. Upon information and belief, reporters from the *Hudson County View* and *Jersey Journal* attended the Holland Gardens press conference. Plaintiffs received a press release of the event but only after it had concluded.

85.    On March 28, 2023, Press Secretary Wallace-Scalcione emailed a media advisory inviting the press to the mayor's "State of the City" address. Plaintiffs did not receive this media

advisory and were not invited to the event. Because Plaintiffs had no prior notice of the event they could not attend and report on it.

86.     On March 31, 2023, Press Secretary Wallace-Scalcione sent a media advisory inviting the press to the opening of the new public safety headquarters. Plaintiffs did not receive this media advisory and were not invited to the event. Because Plaintiffs had no prior notice of the event they could not attend and report on it.

87.     On April 3, 2023, Press Secretary Wallace-Scalcione sent an updated media advisory inviting over 200 press organizations/journalists about the opening of the public safety headquarters. She also sent this same media advisory to an unknown number of media outlets on April 4 and a reminder about it on April 10, 2023. Plaintiffs did not receive these media advisories. Because Plaintiffs had no prior notice of the event they could not attend and report on it. Plaintiffs received a press release about the event on April 11, 2023, after it had concluded.

88.     On April 10, 2023, Press Secretary Wallace-Scalcione sent a media advisory to the press inviting them to the opening of a public safety headquarters to be held on April 11, 2023. A reminder email containing the same media advisory was sent again to the press that same day. Plaintiffs were not invited to the event. Because Plaintiffs had no prior notice of the event they could not attend and report on it. Plaintiffs only received a press release about it after it had concluded.

89.     On April 18, 2023, Press Secretary Wallace-Scalcione sent a press release announcing an event or press conference held by the Mayor on April 18 marking Earth Day. Because this event was covered by other media, it is presumed that other members of the press had advance notice of the April 18 event. Plaintiffs were not invited to the event and only

received a press release about it after it had concluded. Because Plaintiffs had no prior notice of the event they could not attend and report on it.

90.    On July 11, 2023, Press Secretary Wallace-Scalcione sent a media advisory to the press about a ribbon-cutting ceremony for a ferry service from Port Liberte. Plaintiffs did not receive this media advisory and were not invited to the event. Because Plaintiffs had no prior notice of the event they could not attend and report on it.

***Plaintiffs' Attorneys Once Again Inform Defendants of Their Continuing Unlawful Conduct Yet Defendants Continue to Violate Plaintiffs' Rights***

91.    On July 25, 2023, attorneys representing Plaintiffs again wrote to the City's Corporation Counsel, objecting to Plaintiffs' removal from the Press List and exclusion from Press Events. The eight-page letter informed Defendants that they were violating Plaintiffs' First and Fourteenth Amendment rights as well as their due process rights and that Defendants were engaging in unlawful First Amendment retaliation and discrimination. The letter included case law and facts obtained from public records requests supporting its legal claims and requested that Defendants immediately return *JCT* to the Press List and resume inviting them to Press Events. The letter requested that the City's attorney respond by no later than August 2, 2023.

92.    Although Plaintiffs' attorneys put Defendants on clear notice that their actions violated constitutional rights protected by both the United States Constitution and the New Jersey Constitution, the City and its attorneys have yet to respond to the July 25, 2023 letter. Defendants deliberately chose to ignore Plaintiffs' attorneys' letter even though it set forth concrete examples of Defendants' constitutional violations and provided strong legal support for all the claims.  Notwithstanding Plaintiffs' objections, Defendants continued to violate Plaintiffs' protected constitutional rights.

93.    On September 11, 2023, Press Secretary Wallace-Scalcione sent a press release to Plaintiffs about a 911 Memorial Service on the Jersey City waterfront to which Plaintiffs were not invited. Based on other news reports about the event, it is clear that other members of the press had notice of the event and were invited to attend so they could report on it. Because Plaintiffs had no prior notice of the event they could not attend and report on it.

94.    On September 13, 2023, at 1:26 p.m., Press Secretary Wallace-Scalcione distributed a press release announcing the debut of a new affordable housing complex. Plaintiffs were not sent the release until after the event had concluded, although its competitor (*The Hudson County View*) was present at the event, having apparently received advance notice. Because Plaintiffs had no prior notice of the event they could not attend and report on it.

95.    On October 17, 2023, Plaintiffs received a press release regarding a press conference the mayor held regarding the New Jersey cannabis law. Plaintiffs were not invited to the press conference and received the press release only after the press conference had concluded. Because Plaintiffs had no prior notice of the press conference they could not attend and report on it.

96.    On November 21, 2023, Plaintiffs received a press release regarding a ceremony Mayor Fulop attended to promote various members of the fire department. Plaintiffs were not invited to the event and received the press release only after the event had concluded. Because Plaintiffs had no prior notice of the ceremony they could not attend and report on it.

97.    On November 24, 2023, attorneys representing Plaintiffs yet again wrote to the City's Corporation Counsel, objecting to Plaintiffs' removal from the Press List and continued exclusion from Press Events. The letter requested, in part, that Defendants end their

unconstitutional treatment of *JCT*, and cease any further discrimination and retaliation against *JCT*.

98.     On December 1, 2023, Press Secretary Wallace-Scalcione sent out a press release about one of the biggest stories of the month involving a Palestinian-American who claimed that he was assaulted while being called a terrorist.  Plaintiffs did not receive the press release but their competitors did.

99.     On December 14, 2023, the City's Corporation Counsel responded to Plaintiffs' attorneys November 24, 2023 letter repeating Defendants' previous claims that Plaintiff *JCT* "is already added to the press list for the City of Jersey City and will receive future press releases and media advisories."

100.     Upon information and belief, on or about December 15, 2023, the City emailed an invitation to various news organizations inviting them to attend a press conference on December 18, 2023, to discuss the 2023 Jersey City Public Safety Recap with the mayor, the City's Public Safety Director and United States Attorney Phil Sellinger. Plaintiffs did not receive this emailed invitation. Because Plaintiffs had no prior notice of the press conference they could not attend and report on it.

101.     Defendants were served with the original complaint in this lawsuit on December 22, 2023. It was only after this lawsuit was filed that Defendant started sending Plaintiffs invitations to Press Events and it is not known whether Plaintiffs are currently receiving all the emails that are widely distributed to other news organizations.

102.     What is known is that this lawsuit is the only reason Defendants have once again invited Plaintiffs to Press Events. Despite several prior requests from Plaintiffs and their attorneys that Defendants invite Plaintiffs to Press Events, Defendants chose to ignore their pleas

and continued to violate well-established and settled law. Defendants had also misrepresented that Plaintiffs would be "added to the list".

103.    Because of Defendants' conduct and obvious animus towards Plaintiffs and because Defendants only started inviting Plaintiffs to Press Events in response to this lawsuit, Defendants can reasonably be expected to once again retaliate or otherwise interfere with Plaintiffs' constitutional rights. Defendants have never acknowledged that they removed Plaintiffs from the Press List nor have they acknowledged that they fully restored Plaintiffs to the Press List. For these reasons, Plaintiffs are entitled to the relief they are seeking.

### Mayor Fulop and Ms. Wallace-Scalcione are Liable in Their Official and Individual Capacities

104.    As mayor of Jersey City, Mayor Fulop is a decision-maker possessing final authority to establish policies, proclamations, practices, customs and/or edicts. Mayor Fulop has discretion to add or remove news organizations and journalists from the Press List as well as the discretion to include or exclude them from Press Events. He also has discretion to direct Ms. Wallace-Scalcione to do so.

105.    As press secretary, Ms. Wallace-Scalcione sends out press releases and media advisories to numerous news organizations and journalists on behalf of the City. She maintains the Press List and, upon information and belief, has discretion to add or remove news organizations and journalists from the Press List as well as the discretion to include or exclude them from Press Events. Upon information and belief, Mayor Fulop has personally and intentionally directed Ms. Wallace-Scalcione to add or remove news organizations and journalists from the Press List.

106.    Mayor Fulop and Ms. Wallace Scalcione, acting under color of law and acting in concert or alone, unlawfully removed Plaintiffs from the Press List and continued to exclude

them from Press Events. They engaged in this conduct to deny Plaintiffs access to information and to deny and chill their First Amendment rights in retaliation for Plaintiffs' criticisms of Mayor Fulop and his administration. Their unlawful conduct is the proximate and direct cause of Plaintiffs' injuries warranting liability in their individual as well as official capacities.

107.    Mayor Fulop and Ms. Scalcione-Wallace, acting under color of law and acting in concert or alone, were personally, directly and intentionally involved in violating Plaintiffs' constitutional rights. Their unlawful conduct is the proximate and direct cause of Plaintiffs' injuries warranting liability in their individual as well as official capacities.

108.    A reasonable official would know that it is clearly established that Plaintiffs' speech is constitutionally protected and that the First Amendment provides Plaintiffs the following guarantees: (i) to report on and publish free from government interference; (ii) to access and receive information, to speak and listen, and to gather news and information; (ii) to criticize public officials and to be free from retaliation for doing so; and (iii) to not be discriminated against on the basis of their content or viewpoint.

109.    A reasonable official would also know that it is clearly established that it is unlawful to retaliate against Plaintiffs and to intentionally treat them differently than others similarly situated when there is no rational basis for that different treatment. A reasonable official would also know that it is unlawful to deprive individuals of a liberty interest without due process of law which requires both notice and opportunity to be heard.

110.    Plaintiffs and their attorneys repeatedly put Defendants on notice that their actions violated Plaintiffs' constitutional rights and, even prior to receiving that notice, Defendants were fully aware that their actions violated Plaintiffs' clearly established constitutional rights.

111.    A reasonable official would know that constitutional violations may arise from the chilling effect of removing a reporter or news organization from the Press List and continuing to exclude them from Press Events. Such conduct is unlawful even if it isn't a complete prohibition against the exercise of First Amendment rights. Unreasonable or arbitrary denial of access constitutes a direct limitation upon the content of news and is therefore unlawful.

112.    Because Mayor Fulop disagreed with the viewpoint and content of the May 20, 2021 Article, considered Plaintiffs to be as "as big hacks as they come" who engaged in "yellow journalism" and "consistently publish outright lies", he established, authorized, implemented, adopted, ratified, and enforced a policy, proclamation, practice, custom, and/or edict of intentionally and unlawfully retaliating against Plaintiffs, denying them access to the Press List, and excluding them from Press Events. He did this by initially removing Plaintiffs from the Press List so that they did not receive any emails from the City whatsoever and then subsequently ensuring that they only received information about Press Events after they occurred. Mayor Fulop conducted these actions in his official and individual capacity as mayor and as the decision-maker with final authority to make decisions and polices on behalf of the City.

113.    Because Mayor Fulop disagreed with the viewpoint and content of the May 20, 2021 Article, considered Plaintiffs to be as "as big hacks as they come" who engaged in "yellow journalism" and "consistently push outright lies", he personally directed Ms. Wallace-Scalcione to retaliate against Plaintiffs and unlawfully deny them access to news and events concerning the City. He did this by directing her to initially remove Plaintiffs from the Press List so that they did not receive any emails from the City whatsoever and then subsequently ensuring that they only received information about Press Events after they occurred. He therefore established,

authorized, implemented, adopted, ratified and/or enforced a policy, proclamation, practice, custom and/or edict of intentionally and unlawfully retaliating against Plaintiffs, denying them access to the Press List, and excluding them from Press Events. Mayor Fulop conducted these actions in his official and individual capacity as mayor and as the decision-maker with final authority to make decisions and polices on behalf of the City.

114.    Because Ms. Wallace-Scalcione disagreed with the viewpoint and content of the May 20, 2021 Article, believed that Defendant JCT "has consistently mispresented information", was "not a legitimate news source" and didn't "hide their political agenda against the Mayor" and because she considered Plaintiff Morrill "a vocal political supporter of the Mayor's opposition" she unlawfully denied Plaintiffs access to news and events concerning the City. She did this by initially removing Plaintiffs from the Press List so that they did not receive any emails from the City whatsoever and then subsequently ensuring that they only received information about Press Events after they occurred. She therefore established, authorized, implemented, adopted, ratified and/or enforced a policy, proclamation, practice, custom and/or edict of intentionally and unlawfully retaliating against Plaintiffs, denying them access to the Press List, and excluding them from Press Events. Her unlawful policy, proclamation, practice, custom and/or edict of intentionally and unlawfully retaliating against Plaintiffs and denying Plaintiffs access to Press Events was also authorized, implemented, adopted, ratified, and/or enforced by Mayor Fulop. Ms. Wallace-Scalcione conducted these actions in her official and individual capacity as press secretary for the City and as the person who maintained and controlled the Press List and invitations to Press Events.

***Harm to Plaintiffs' Reporting and First Amendment-Protected Activities***

115.    By not receiving invitations to Press Events, Plaintiffs were significantly harmed in their ability to access and gather news and to inform their readers of breaking news. Each missed news event amounts to a significant injury, one that puts Plaintiffs at a competitive disadvantage and robs Plaintiffs' readers of the opportunity to be fully informed of current events.

116.    Defendants' actions chilled Plaintiffs' protected speech. Plaintiffs were unable to provide timely coverage of newsworthy events taking place in the City due to their removal from the Press List and continued exclusion from Press Events. Plaintiffs' injuries will continue until they are fully restored to the Press List, receive invitations to all Press Events, and receive all emails that are widely distributed to other news organizations and journalists.

117.    For online publications such as *JCT*, timely access to newsworthy events is paramount.

118.    Other members of the press who have not published stories critical of the mayor's statements concerning crime rates and/or the trip to Paris remain on the Press List and continue to receive invitations to Press Events.

119.    Other members of the press that Defendants deem "legitimate press" and those that they do not consider a "completely bias [*sic*] blog" remain on the Press List and continue to receive invitations to Press Events.

120.    Invitations to Press Events continue to be sent not only to *JCT*'s local competitors but also inexplicably to major national news organizations such as ABC News, the Huffington Post, and The New York Times, all of which infrequently cover City events.

121.    Defendants continued refusal to return Plaintiffs to the Press List and their continued failure to invite Plaintiffs to a single Press Event severely impacted Plaintiffs'

reporting and is a separate and new violation of Plaintiffs rights under the United States Constitution and New Jersey Constitution. Plaintiffs' rights will continue to suffer harm until they are fully restored to the Press List, receive invitations to all Press Events, and receive all emails that are widely distributed to other news organizations and journalists.

122.    Defendants' conduct is clearly punitive and retaliatory. Their conduct has no legitimate purpose but is instead motivated by opposition to Plaintiffs' exercise of their freedom of speech and their constitutionally protected right to criticize City officials.

123.    Defendants are aware that their conduct is unlawful and yet they continue their policy, proclamation, practice, custom, and/or edict of unconstitutional retaliation, discrimination, and denial of Due Process and Equal Protection.

124.    Plaintiffs and Plaintiffs' counsel certainly reminded Defendants that their conduct was unlawful in their correspondence to Defendants and their counsel on July 21, 2021, April 7, 2022, April 24, 2022, July 25, 2023, and November 24, 2023.

125.    Defendants flagrantly ignore their official duty to comply with the law and have reacted in a vindictive and punitive manner to silence criticism of what they deem biased or illegitimate reporting.

126.    Plaintiffs' injuries are a direct and proximate cause of Defendants' actions. The loss of First Amendment rights, even momentarily, constitutes irreparable harm.

127.    Defendants' conduct is intentional, willful, malicious, reckless, and callous and their actions are motivated by ill will, spite and an evil motive or intent.

## CAUSES OF ACTION

### COUNT I – 42 U.S.C. § 1983 – First Amendment Retaliation
### (Against All Defendants)

128.    Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as though each were individually stated herein.

129.    Plaintiffs wrote and published the May 20, 2021 Article, which criticized Mayor Fulop's characterization of crime statistics.

130.    Plaintiffs' writing and publishing of the May 20, 2021 Article is constitutionally protected under the First Amendment's free speech and free press clauses.

131.    Defendants were aware of Plaintiffs' reporting, disapproved of it, and removed Plaintiffs from the Press List shortly after the May 20, 2021 Article was published.

132.    Plaintiffs and their attorneys repeatedly requested that Plaintiffs be returned to the Press List so that they could be invited to Press Events and report on matters of public concern.

133.    Defendants represented that Plaintiffs were restored to the Press List in April 2022, however, Plaintiffs were not restored to the Press List and only received notice of Press Events after they occurred. Other journalists and news organizations were and continue to be invited to Press Events and have not been retaliated against for their protected speech.

134.    Defendants have made numerous statements reflecting their animus and contempt towards Plaintiffs.

135.    The timing of Defendants' actions coupled with comments made by Defendants reflecting their animus towards Plaintiffs demonstrates that the removal from the Press List and subsequent exclusion from Press Events was substantially motivated by Plaintiffs' constitutionally protected activities—specifically the reporting on and criticisms of Mayor Fulop and his administration by Plaintiffs.

136.    The temporal proximity between Plaintiffs' protected activity and Defendants' pattern of animus towards Plaintiffs establishes a causal link between Plaintiffs' constitutionally protected activities and the retaliatory action—removal from the Press List.

137.    By removing Plaintiffs from the Press List and continuing to exclude them from Press Events, Defendants seek to silence criticism and impede Plaintiffs' newsgathering and reporting.

138.    Defendants' actions would deter a person of ordinary firmness from publishing stories critical of the mayor and his administration and chill their protected speech because exclusion from the Press List hinders timely and effective reporting.

139.    Defendants' actions chilled Plaintiffs' protected speech. Plaintiffs were unable to provide timely coverage of newsworthy events taking place in the City due to their removal from the Press List and continued exclusion from Press Events. Plaintiffs' rights will continue to be violated until they are fully restored to the Press List, receive invitations to all Press Events, and receive all emails that are widely distributed to other news organizations and journalists.

140.    Defendants' retaliatory conduct interferes with and restricts Plaintiffs' ability to gather and publish the news.

141.    Plaintiffs are being forced to alter their constitutionally protected activities as a result of their exclusion from the Press List and continued exclusion from Press Events.

142.    Acting under color of law, Defendants established, authorized, implemented, adopted, ratified, and enforced a written or unwritten policy, proclamation, custom and/or edict of interfering with and violating Plaintiffs' constitutional rights.

143.    It is well-settled and clearly established that Plaintiffs were engaged in protected speech and that the First Amendment prohibits government officials from retaliating against the

31

press for engaging in protected speech and for discriminating against them on the basis of the content and viewpoint of that speech.

144.    A reasonable official would know that constitutional violations may arise from the chilling effect of removing a reporter or news organization from the Press List and continuing to exclude them from Press Events. Such conduct is unlawful even if it is not a complete prohibition against the exercise of First Amendment rights. Unreasonable or arbitrary denial of access constitutes a direct limitation upon the content of news and is therefore unlawful.

145.    A reasonable official would know that it is unlawful to discriminate and retaliate against news organizations and journalists for exercising their free speech rights. A reasonable official would also know that it is unlawful to discriminate and retaliate against news organizations and journalists based on the content and viewpoint of their speech.

146.    Defendants know that their actions are unlawful and violate Plaintiffs constitutional rights.

147.    Defendants have violated the provisions of 42 U.S.C. § 1983 by, acting under color of state law, depriving Plaintiffs of the privileges secured by the First Amendment of the United States Constitution.

148.    Defendants' actions constitute unlawful retaliation against Plaintiffs in violation of their First Amendment rights of free speech and freedom of the press.

149.    Plaintiffs' injuries are a direct and proximate cause of Defendants' actions. The loss of First Amendment rights, even momentarily, constitutes irreparable harm.

150.    Defendants' conduct is intentional, willful, malicious, reckless, and callous and their actions are motivated by ill will, spite and an evil motive or intent.

151.    Plaintiffs' reporting was impacted each time they did not receive an invitation to a Press Event and each failure by Defendants to invite Plaintiffs to a Press Event is a separate and new violation of Plaintiffs rights under the United States Constitution.

152.    Unless enjoined by this Court, Defendants will continue to violate the First Amendment rights of Plaintiffs and Plaintiffs will continue to suffer serious and irreparable harm to their constitutional rights.

153.    Plaintiffs are also entitled to prospective equitable relief in the form of a declaratory judgment because an actual controversy exists between the parties and a declaratory judgment is necessary and appropriate to clarify and settle the legal issues between the parties and for the guidance of government actors going forward.

### COUNT II – 42 U.S.C. § 1983 – First & Fourteenth Amendment Equal Protection (Against All Defendants)

154.    Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as though each were individually stated herein.

155.    Defendants intentionally treat Plaintiffs differently than other news organizations and there is no rational basis, much less compelling reason, for the difference in treatment.

156.    Plaintiffs have First Amendment liberty interests in access to information, the right to receive information, the right to speak, the right to listen, and the right to gather and publish the news.

157.    The First Amendment requires that "[o]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable." *Am. Broadcasting Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977).

158.    It is well-settled and clearly established that the government cannot intentionally treat news organizations and journalists differently than those similarly situated without a rational basis for the difference in treatment.

159.    A reasonable official would know that constitutional violations may arise from the chilling effect of removing a reporter or news organization from the Press List and continuing to exclude them from Press Events. Such conduct is unlawful even if it isn't a complete prohibition against the exercise of First Amendment rights. Unreasonable or arbitrary denial of access constitutes a direct limitation upon the content of news and is therefore unlawful.

160.    A reasonable official would know that the Equal Protection Clause of the Fourteenth Amendment requires government to grant equal treatment to its citizens and not discriminate among them with respect to their fundamental rights. It requires all journalists have equal access to information—a right protected by the First Amendment—generally available to news media.

161.    Defendants treat Plaintiffs differently than similarly situated journalists and news organizations.

162.    Plaintiff *JCT* is one of the chief purveyors of news in Jersey City and therefore is similarly situated to other news organizations who remain on the Press List.

163.    Plaintiff Morrill covers news about Jersey City and therefore is similarly situated to other reporters who remain on the Press List.

164.    Defendants removed Plaintiffs from the Press List and then continued to exclude them from Press Events while other similarly situated reporters and news organizations remain on the Press List and are invited to Press Events.

165.    Upon information and belief, Plaintiffs are the only news organization and reporter that were removed from the Press List and subsequently excluded from Press Events.

166.    Defendants' removal of Plaintiffs from the Press List and continued exclusion of Plaintiffs from Press Events is intentional and motivated by the content and viewpoint of Plaintiffs' reporting on Mayor Fulop and his administration and Defendants' retaliatory animus towards Plaintiffs.

167.    Such content-based discrimination, viewpoint-based discrimination, and animus cannot constitute a rational basis, much less a compelling reason, for the difference in treatment.

168.    Plaintiffs are in a class of one, and their exclusion from the Press List and unequal access to the benefits of being on the Press List is a denial of the equal protection of their First Amendment protected rights and a violation of the Fourteenth Amendment.

169.    Acting under color of law, Defendants established, authorized, implemented, adopted, ratified, and enforced a written or unwritten policy, practice, proclamation, custom and/or edict of interfering with and violating Plaintiffs' constitutional rights.

170.    By removing Plaintiffs from the Press List and then continuing to exclude them from Press Events, Defendants treated them differently than similarly situated reporters and news organizations.

171.    Defendants have violated the provisions of 42 U.S.C. § 1983 by, acting under color of state law, depriving Plaintiffs of the privileges secured by the First and Fourteenth Amendments of the United States Constitution.

172.    Defendants' actions chilled Plaintiffs' protected speech. Plaintiffs were unable to provide timely coverage of newsworthy events taking place in the City due to their removal from the Press List and continued exclusion from Press Events. Plaintiffs' rights will continue to be

violated until they are fully restored to the Press List, receive invitations to all Press Events, and receive all emails that are widely distributed to other news organizations and journalists.

173.    For online publications such as *JCT*, timely access to newsworthy events is paramount.

174.    Plaintiffs' injuries are a direct and proximate cause of Defendants' actions. The loss of First Amendment rights, even momentarily, constitutes irreparable harm.

175.    Defendants' conduct is intentional, willful, malicious, reckless, and callous and their actions are motivated by ill will, spite and an evil motive or intent.

176.    Plaintiffs' reporting was impacted each time they did not receive an invitation to a Press Event and each failure by Defendants to invite Plaintiffs to a Press Event is a separate and new violation of Plaintiffs rights under the United States Constitution.

177.    Unless enjoined by this Court, Defendants will continue to violate the First and Fourteenth Amendment rights of Plaintiffs and Plaintiffs will continue to suffer serious and irreparable harm to their constitutional rights.

178.    Plaintiffs are also entitled to prospective equitable relief in the form of a declaratory judgment because an actual controversy exists between the parties and a declaratory judgment is necessary and appropriate to clarify and settle the legal issues between the parties and for the guidance of government actors going forward.

## COUNT III – 42 U.S.C. § 1983 –First Amendment Equal Access
### (Against All Defendants)

179.    Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as though each were individually stated herein.

180.    Plaintiffs have a First Amendment right to access information, the right to receive information, the right to speak, the right to listen, and the right to gather and publish the news.

181.    The First Amendment requires that "[o]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer by tenable." *Am. Broadcasting Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977).

182.    It is well-settled and clearly established that the government cannot intentionally treat news organizations and journalists differently than those similarly situated without a rational basis for the difference in treatment.

183.    A reasonable official would know that constitutional violations may arise from the chilling effect of removing a reporter or news organization from the Press List and continuing to exclude them from Press Events. Such conduct is unlawful even if it isn't a complete prohibition against the exercise of First Amendment rights. Unreasonable or arbitrary denial of access constitutes a direct limitation upon the content of news and is therefore unlawful.

184.    A reasonable official would know that the Equal Protection Clause of the Fourteenth Amendment requires government to grant equal treatment to its citizens and not discriminate among them with respect to their fundamental rights. It requires all journalists have equal access to information—a right protected by the First Amendment—generally available to news media.

185.    Defendants treat Plaintiffs differently from similarly situated journalists and news organizations.

186.    Plaintiff *JCT* is a news publication which covers news in Jersey City and issues of public concern to its residents and therefore is similarly situated to other news organizations that remain on the Press List.

37

187.    Plaintiff Morrill covers news about Jersey City and therefore is similarly situated to other reporters who remain on the Press List.

188.    Defendants removed Plaintiffs from the Press List, while other reporters and news organizations remained on the Press List including national news organizations and hyperlocal websites such as *Everything Jersey City*.

189.    Upon information and belief, Plaintiffs are the only news organization and reporter that were removed from the Press List and then continued to be excluded from Press Events.

190.    Defendants' removal of Plaintiffs from the Press List and continued exclusion from Press Events is intentional and motivated by the content and viewpoint of Plaintiffs' reporting on Mayor Fulop and his administration and Defendants' animus towards Plaintiffs.

191.    Such content-based discrimination, viewpoint-based discrimination, and animus cannot constitute a rational basis, much less a compelling reason, for the difference in treatment.

192.    By removing Plaintiffs from the Press List and then continuing to exclude them from Press Events, Defendants treated Plaintiffs differently than similarly situated reporters and news organizations.

193.    Defendants seek to silence criticism and impede Plaintiffs' newsgathering and reporting. It is not known if Plaintiffs have been fully restored to the Press List or whether they are receiving all the emails that are widely distributed to other news organizations and journalists.

194.    Acting under color of law, Defendants established, authorized, implemented, adopted, ratified, and enforced a written or unwritten policy, practice, proclamation, custom and/or edict of interfering with and violating Plaintiffs' constitutional rights.

195.    Defendants have violated the provisions of 42 U.S.C. § 1983 by, acting under color of state law, depriving Plaintiffs of the privileges secured by the First Amendment of the United States Constitution.

196.    Defendants' actions chilled Plaintiffs' protected speech. Plaintiffs were unable to provide timely coverage of newsworthy events taking place in the City due to their removal from the Press List and continued exclusion from Press Events. Plaintiffs' rights will continue to be violated until they are fully restored to the Press List, receive invitations to all Press Events, and receive all emails that are widely distributed to other news organizations and journalists..

197.    For online publications such as *JCT*, timely access to newsworthy events is paramount.

198.    Plaintiffs' injuries are a direct and proximate cause of Defendants' actions. The loss of First Amendment rights, even momentarily, constitutes irreparable harm.

199.    Defendants' conduct is intentional, willful, malicious, reckless, and callous and their actions are motivated by ill will, spite and an evil motive or intent.

200.    Plaintiffs' reporting was impacted each time they did not receive an invitation to a Press Event and each failure by Defendants to invite Plaintiffs to a Press Event is a separate and new violation of Plaintiffs rights under the United States Constitution.

201.    Unless enjoined by this Court, Defendants will continue to violate the First Amendment rights of Plaintiffs and Plaintiffs will continue to suffer serious and irreparable harm to their constitutional rights.

202.    Plaintiffs are also entitled to prospective equitable relief in the form of a declaratory judgment because an actual controversy exists between the parties and a declaratory

judgment is necessary and appropriate to clarify and settle the legal issues between the parties and for the guidance of government actors going forward.

**COUNT IV – 42 U.S.C. § 1983 –Viewpoint- and/or Content-Based Discrimination in Violation of First Amendment Rights of the Freedom of Speech and Freedom of the Press (Against All Defendants)**

203.    Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as though each were individually stated herein.

204.    Plaintiffs have a First Amendment right to access information, the right to receive information, the right to speak, the right to listen, and the right to gather and publish the news.

205.    Defendants' decision to remove Plaintiffs from the Press List and subsequent decision to exclude them from Press Events is based on Plaintiffs' viewpoint and the content of their speech and is a violation of the First Amendment.

206.    It is well-settled and clearly established that Plaintiffs were engaged in protected speech and that the First Amendment prohibits government officials from retaliating against the press for engaging in protected speech and for discriminating against them on the basis of the content and viewpoint of that speech.

207.    A reasonable official would know that constitutional violations may arise from the chilling effect of excluding a reporter or news organization from a Press List and Press Event even if doing so isn't a complete prohibition against the exercise of First Amendment rights. Unreasonable or arbitrary denial of access constitutes a direct limitation upon the content of news and is therefore unlawful.

208.    A reasonable official would know that it is unlawful to discriminate and retaliate against news organizations and journalists for exercising their free speech rights.  A reasonable official would also know that it is unlawful to discriminate and retaliate against news organizations and journalists based on the content and viewpoint of their speech.

209.    In response to the May 20, 2021 Article, Defendants removed Plaintiffs from the City's Press List thereby denying Plaintiffs access to Press Events.

210.    By removing Plaintiffs from the Press List and Press Events, Defendants have deprived Plaintiffs of their right to access and receive information, their right to speak, their right to listen, and their right to gather and publish the news. Plaintiffs have been deprived of their right to effectively report on and publish news about Jersey City.

211.    Defendants' deliberate exclusion of Plaintiffs from the Press List and Press Events is motivated by Plaintiffs' critical reporting on Mayor Fulop and constitutes unlawful content and viewpoint discrimination.

212.    Defendants have no lawful reason for removing Plaintiffs from the Press List and continued exclusion from Press Events and, even if they did, their conduct is not rationally related, much less, narrowly tailored, to achieve any legitimate governmental interest.

213.    Acting under color of law, Defendants established, authorized, implemented, adopted, ratified, and enforced a written or unwritten written or unwritten policy, practice, proclamation, custom and/or edict of interfering with and violating Plaintiffs' constitutional rights.

214.    Defendants have violated the provisions of 42 U.S.C. § 1983 by, acting under color of state law, depriving Plaintiffs of the privileges secured by the First Amendment of the United States Constitution.

215.    Defendants' actions chilled Plaintiffs' protected speech. Plaintiffs were unable to provide timely coverage of newsworthy events taking place in the City due to their removal from the Press List and continued exclusion from Press Events. Plaintiffs' rights will continue to be

violated until they are fully restored to the Press List, receive invitations to all Press Events, and receive all emails that are widely distributed to other news organizations and journalists.

216.    For online publications such as *JCT*, timely access to newsworthy events is paramount.

217.    Plaintiffs' injuries are a direct and proximate cause of Defendants' actions. The loss of First Amendment rights, even momentarily, constitutes irreparable harm.

218.    Defendants' conduct is intentional, willful, malicious, reckless, and callous and their actions are motivated by ill will, spite and an evil motive or intent.

219.    Plaintiffs' reporting was impacted each time they did not receive an invitation to a Press Event and each failure by Defendants to invite Plaintiffs to a Press Event is a separate and new violation of Plaintiffs rights under the United States Constitution.

220.    Unless enjoined by this Court, Defendants will continue to violate the First Amendment rights of Plaintiffs and Plaintiffs will continue to suffer serious and irreparable harm to their constitutional rights.

221.    Plaintiffs are also entitled to prospective equitable relief in the form of a declaratory judgment because an actual controversy exists between the parties and a declaratory judgment is necessary and appropriate to clarify and settle the legal issues between the parties and for the guidance of government actors going forward.

### COUNT V – 42 U.S.C. § 1983 – Fourteenth Amendment Due Process
### (Against All Defendants)

222.    Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as though each were individually stated herein.

223.    Government entities, including the Defendants here, cannot deprive individuals of a property or liberty interest without due process of law.

224.    It is well-settled and clearly established that Plaintiffs were engaged in protected speech and that the First Amendment prohibits government officials from retaliating against the press for engaging in protected speech and for discriminating against them on the basis of the content and viewpoint of that speech. It is also well-settled and clearly established that the government cannot intentionally treat news organizations and journalists differently than those similarly situated without a rational basis for the difference in treatment and that procedural due process requires both notice and an opportunity to be heard at a meaningful time and in a meaningful manner.

225.    A reasonable official would know that constitutional violations may arise from the chilling effect of removing a reporter or news organization from the Press List and continuing to exclude them from Press Events. Such conduct is unlawful even if it isn't a complete prohibition against the exercise of First Amendment rights. Unreasonable or arbitrary denial of access constitutes a direct limitation upon the content of news and is therefore unlawful.

226.    A reasonable official would know that the government cannot intentionally treat news organizations and journalists differently than those similarly situated without a rational basis for the difference in treatment and that procedural due process requires both notice and an opportunity to be heard at a meaningful time and in a meaningful manner.

227.    Plaintiffs' have a strong First Amendment liberty interest in full access to the Press List and Press Events in the exercise of their First Amendment right to access information, the right to receive information, the right to speak, the right to listen, and the right to gather and publish the news.

228.    Defendants unlawfully retaliated against Plaintiffs for exercising their constitutionally protected rights of free speech and freedom of the press.

229.    Defendants provided no notice to Plaintiffs that they were being removed from the Press List nor did they provide notice as to why they only received invitations to Press Events after they occurred even though they had represented that Plaintiffs would be "added to the list". Defendants. have no published objective criteria for how one gains access to, remains on, or can be excluded from the Press List or Press Events. Defendants' exclusion of Plaintiffs from the Press List and Press Events does not provide Plaintiffs an opportunity to be heard before revoking their access. Nor have Defendants provided Plaintiffs with any avenue to challenge or appeal the decision to remove their access.

230.    Any interest Defendants have in instituting and enforcing the ban from the Press List and Press Events does not justify depriving Plaintiff of an opportunity to be heard or challenge their removal and lack of full access to the benefits of being on the Press List.

231.    Defendants' written or unwritten policy, practice, proclamation, custom and/or edict upon which it relies is unconstitutionally vague, provides Defendants with complete discretion on removals from the Press List as well as exclusions from Press Events.

232.    Acting under color of law, Defendants established, authorized, implemented, adopted, ratified, and enforced a written or unwritten policy, practice, proclamation, custom and/or edict of interfering with and violating Plaintiffs' constitutional rights—and continue to do so.

233.    Defendants have violated the provisions of 42 U.S.C. § 1983 by, acting under color of law, depriving Plaintiffs of the privileges secured by the Fourteenth Amendment of the United States Constitution.

234.    Plaintiffs' injuries are a direct and proximate cause of Defendants' actions. The loss of First Amendment rights, even momentarily, constitutes irreparable harm.

235.    Defendants' conduct is intentional, willful, malicious, reckless, and callous and their actions are motivated by ill will, spite and an evil motive or intent.

236.    Plaintiffs' reporting was impacted each time they did not receive an invitation to a Press Event and each failure by Defendants to invite Plaintiffs to a Press Event is a separate and new violation of Plaintiffs rights under the United States Constitution.

237.    Unless enjoined by this Court, Defendants will continue to violate the due process rights of Plaintiffs and Plaintiffs will continue to suffer serious and irreparable harm to their constitutional rights.

238.    Plaintiffs are also entitled to prospective equitable relief in the form of a declaratory judgment because an actual controversy exists between the parties and a declaratory judgment is necessary and appropriate to clarify and settle the legal issues between the parties and for the guidance of government actors going forward.

## COUNT VI – Article I of the Constitution of New Jersey
### (Against all Defendants)

239.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

240.    The Constitution of New Jersey, Article I, Section 6, provides, in pertinent part, that "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." Article I, Section 1 provides, in pertinent part: "All persons are by nature free and independent, and have certain natural and inalienable rights, among which are those of enjoying and defending life and liberty."

241.    The New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c) provides, in pertinent part, that "[a]ny person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief."

242.    Plaintiffs have a First Amendment right to access information, the right to receive information, the right to speak, the right to listen, and the right to gather and publish the news.

243.    In response to the May 20, 2021 Article, Defendants removed Plaintiffs from the City's Press List thereby denying Plaintiffs access to Press Events.

244.    By removing Plaintiffs from the Press List and continuing to exclude them from Press Events, Defendants have deprived Plaintiffs of their right to access and receive information, their right to speak, their right to listen, and their right to gather and publish the news. Plaintiffs have been deprived of their right to effectively report on and publish news about Jersey City.

245.    Defendants' conduct is motivated by Plaintiffs' critical reporting on Mayor Fulop and constitutes unlawful retaliation and content and viewpoint discrimination.

246.    Defendants have no lawful reason for removing Plaintiffs from the Press List and excluding them from Press Events and, even if they did, their conduct is not rationally related, much less, narrowly tailored, to achieve any legitimate governmental interest.

247.    Acting under color of law, Defendants established, authorized, implemented, adopted, ratified, and enforced a written or unwritten written or unwritten policy, practice, proclamation, custom and/or edict of interfering with and violating Plaintiffs' constitutional rights.

248.    Defendants' decision to remove Plaintiffs from the Press List and decision to exclude them from Press Events is based on Plaintiffs' viewpoint and the content of their speech and is a violation of the First Amendment.

249.    It is well-settled and clearly established that Plaintiffs were engaged in protected speech and that the First Amendment prohibits government officials from retaliating against the press for engaging in protected speech and for discriminating against them on the basis of the content and viewpoint of that speech. It is also well-settled and clearly established that the government cannot intentionally treat news organizations and journalists differently than those similarly situated without a rational basis for the difference in treatment and that requires procedural due process requires both notice and an opportunity to be heard at a meaningful time and in a meaningful manner.

250.    A reasonable official would know that constitutional violations may arise from the chilling effect of removing a reporter or news organization from the Press List and continuing to exclude them from Press Events. Such conduct is unlawful even if it isn't a complete prohibition against the exercise of First Amendment rights. Unreasonable or arbitrary denial of access constitutes a direct limitation upon the content of news and is therefore unlawful.

251.    A reasonable official would know that it is unlawful to discriminate and retaliate against news organizations and journalists for exercising their free speech rights.  A reasonable

official would also know that it is unlawful to discriminate and retaliate against news organizations and journalists based on the content and viewpoint of their speech.

252.    A reasonable official would know that the government cannot intentionally treat news organizations and journalists differently than those similarly situated without a rational basis for the difference in treatment and that requires procedural due process requires both notice and an opportunity to be heard at a meaningful time and in a meaningful manner.

253.    By engaging in the aforementioned course of conduct under the color of state law, and by causing Plaintiffs to be deprived of its constitutionally guaranteed First and Fourteenth Amendment rights, and corresponding rights guaranteed by the New Jersey State Constitution, Article I, Section 6 Defendants have violated the New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c).

254.    Defendants acting under the color of law have individually and collectively deprived Plaintiffs of constitutional rights in violation of N.J.S.A. 10:6-2(c).

255.    Plaintiffs' injuries are a direct and proximate cause of Defendants' actions. The loss of First Amendment rights, even momentarily, constitutes irreparable harm.

256.    Defendants' conduct is intentional, willful, malicious, reckless, and callous and their actions are motivated by ill will, spite and an evil motive or intent.

257.    Plaintiffs' reporting was impacted each time they did not receive an invitation to a Press Event and each failure by Defendants to invite Plaintiffs to a Press Event is a separate and new violation of Plaintiffs rights under the United States Constitution.

## PRAYER FOR RELIEF

258.    WHEREFORE, Plaintiffs respectfully request that the Court:

a.  Enter a permanent injunction requiring Defendants to fully restore Plaintiffs to the Press List and inviting them to Press Events on an equal basis as similarly situated journalists and news organizations;

b.  Enter a permanent injunction requiring Defendants to treat Plaintiffs similar to other members of the press and not retaliate or discriminate against Plaintiffs based on the content or viewpoint of their reporting;

c.  Enter a judgment declaring that Defendants, in their individual and official capacities, violated constitutional rights with respect to each Count above;

d.  Award Plaintiffs compensatory, nominal and punitive damages on all counts;

e.  Award Plaintiffs costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and N.J.S.A. 10:6-2(f); and

f.  Grant such other relief as the Court deems just and proper.

Dated: March 14__, 2024                     Respectfully submitted,

/s/ _____
Steven P. Weissman, Esq.
Brett M. Pugach, Esq.
Flavio L. Komuves, Esq.
Weissman & Mintz
220 Davidson Ave., Suite 410
Somerset, NJ 08873
Phone: (732) 563-4565
sweissman@weissmanmintz.com
fkomuves@weissmanmintz.com
bpugach@weissmanmintz.com

Jennifer Borg, Esq.
Media Freedom & Information
Access Clinic

Yale Law School[1]
PO Box 1709
Englewood Cliffs, NJ 07632
(201) 280-5501
Jennifer.borg@yale.edu

*Attorneys for Plaintiffs Aaron Morrill
and The Jersey City Times, LLC*

---

[1] Tobin Raju, Clinical Fellow, and Law Students Amara Banks, Victoria Maras, Federico Roitman, and Isaac May were integral to the research, drafting, and editing of this complaint. The views expressed herein do not purport to represent the institutional views of Yale Law School, if any.